IN THE SUPREME COURT OF TENNESSEE
AT MEMPHIS
November 4, 2008 Session

# HIGHWOODS PROPERTIES, INC. ET AL.
## v.
# CITY OF MEMPHIS

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Shelby County**
**No. CH-06-2070-1     Walter L. Evans, Judge**

---

**No. W2007-00454-SC-R11-CV - Filed July 27, 2009**

---

The Plaintiffs filed an action for declaratory judgment seeking to set aside a consent judgment entered in a lawsuit between property owners in an area of a proposed annexation and the City of Memphis.  The earlier lawsuit, which the Plaintiffs failed to timely join, was a *quo warranto* challenge to an ordinance purporting to annex certain territory contiguous to the boundaries of the City. The consent judgment provided for the annexation of the territory described within the ordinance in two stages, with a portion of the area having an effective annexation date in 2006 and the remainder having an effective date in 2013.  The trial court dismissed the complaint and the Court of Appeals affirmed.  We granted permission to appeal in order to determine the propriety of the challenge to the consent decree approving of the two-step annexation.  We hold that (1) the Plaintiffs are not authorized to file a declaratory judgment action challenging the consent judgment as violative of the terms of the annexation ordinance; and (2) the consent judgment did not create an unconstitutional taxing structure.  The judgment of dismissal is, therefore, affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined.  WILLIAM C. KOCH, JR., J. filed a separate dissenting opinion.

John S. Golwen, Colleen Denise Hitch, and Amy Charlyne Worrell, Memphis, Tennessee, for the appellant, Highwoods Properties, Inc., Highwoods Realty LP, Highwoods/Tennessee Holdings, LP, and AP Southeast Portfolio Partners, LP.

Jonathan C. Hancock,  Ross Emerson Webster, Don Lester Hearn, Jr.,  Memphis, Tennessee, for the appellee, City of Memphis.

# OPINION

This appeal arises out of a declaratory judgment action filed by Highwoods Properties, Inc., Highwoods Realty Limited Partnership, Highwoods/Tennessee Holdings LP, and Southeast Portfolio Partners, LP (the "Plaintiffs"), all of whom are landowners and developers, against the City of Memphis (the "City"), challenging the annexation of adjacent territory known as Southwind-Windyke Annexation Area No. 42 ("Area 42"). When the trial court granted a motion to dismiss by the City, the Plaintiffs appealed. The Court of Appeals affirmed.

## Factual and Procedural Background

The facts underlying this dispute are largely uncontested. On November 4, 1997, the Memphis City Council enacted Ordinance No. 4513 (the "Ordinance"), adopting a proposal to annex Area 42, a property adjacent to its city limits. The Ordinance provided as follows:

> [T]he City of Memphis on its own initiative is authorized to annex territory if it appears that the prosperity of the City of Memphis and of the territory will be materially retarded, and the safety and welfare of the inhabitants and property thereof endangered if said property is not annexed to the city of Memphis. . . .
>
> . . . .
>
> [I]t was determined by the Council of the City of Memphis that the proposed annexation reflects the planned and orderly growth and development of the City of Memphis taking into consideration the characteristics of the City of Memphis and those of the area proposed for annexation and is reasonable for the overall well being of the City of Memphis and the proposed area to be annexed; that it appears that the prosperity of the City of Memphis and the affected territory will be materially retarded and safety and welfare of the inhabitants and property thereof endangered if such area is not annexed to the City of Memphis; that, therefore, it is in the best interest, safety and welfare of the inhabitants and property of said territory as well as the municipality as a whole to annex [Area 42] to the boundaries of the City of Memphis.

The Ordinance incorporated a detailed "Plan of Services" setting forth the expected dates by which enumerated city services would be extended to the annexed area.

On December 3, 1997, a number of the property owners within Area 42 filed three separate *quo warranto* proceedings challenging the propriety of the annexation. See Tenn. Code Ann. § 6-51-103 (2005). All were timely filed within thirty days of the passage of the Ordinance. See State ex rel. Bastnagel v. City of Memphis, 457 S.W.2d 532, 535 (Tenn. 1970). Pursuant to statute, the three *quo warranto* actions were consolidated in the Chancery Court for Shelby County. See Tenn. Code Ann. § 6-51-103(d) ("If more than one (1) [*quo warranto*] suit is filed, all of them shall be consolidated and tried as one (1) in the first court of appropriate jurisdiction in which suit is filed.").

Although the record does not include the details of the litigation, the pleadings do establish that the suit concluded in a settlement in 2006. None of the Plaintiffs in the present case, however, were among the property owners involved in the 1997 litigation.

On December 29, 2005, while the consolidated 1997 challenges were still pending, Highwoods Properties, Inc. ("Highwoods Properties"), one of the Plaintiffs in this litigation, filed a separate *quo warranto* challenge to the annexation, seeking to have its suit consolidated with those filed in 1997. A month later, Highwoods Properties filed an amended complaint, adding Highwoods Realty Limited Partnership, Highwoods/Tennessee Holdings LP, and Southeast Portfolio Partners, LP, as Plaintiffs. The Amended Complaint contained allegations that the City had "neither . . . the ability nor the intent to render municipal services to the subject annexation area to the extent as other areas already within the City of Memphis are receiving" and included assertions that the City had initiated the annexation for the "imposition and collection of taxes [with] an intent to increase the revenues of the City of Memphis . . . ." The Plaintiffs further contended that a "potential Consent Judgment" between the City and the property owners in the 1997 consolidated actions "included terms especially detrimental to the Plaintiffs and inconsistent with the ordinance . . . as passed." On March 3, 2006, the trial court dismissed the complaint as untimely. The Plaintiffs appealed and the Court of Appeals affirmed the dismissal. Highwoods Props., Inc. v. City of Memphis, No. W2006-00732-COA-R3-CV, 2006 WL 3628102 (Tenn. Ct. App. Dec. 14, 2006) ("Highwoods Properties I"). There was no application for permission to appeal to this Court.

On May 10, 2006, during the course of the appeal by the Plaintiffs, the trial court approved and entered a "Consent Final Judgment" in settlement of the 1997 challenge to the annexation. On June 8, 2006, an "Amended Consent Final Judgment" superceding the initial judgment was approved for entry. The amended judgment divided Area 42 into five sections, which appear below:



The terms of the final settlement provided for each of the five sections of Area 42 to become a part of the City; however, the annexation of areas A1, A2, and A3 (collectively "Area A") was to become effective on December 31, 2006, while the annexation of areas B1 and B2 (collectively "Area B") would be delayed until December 31, 2013.[1]

On October 24, 2006, during the pendency of their appeal in the *quo warranto* action, the Plaintiffs, owning property located in Area A, filed suit for declaratory judgment asking the chancery court to rule (1) "that the Consent Final Judgment and Amended Consent Final Judgment are invalid" and (2) "that . . . Area 42 has not been annexed by the City." As grounds, the Plaintiffs first alleged that "[a] genuine dispute exists as to whether the . . . Ordinance, as amended through the Consent Final Judgment and Amended Consent Final Judgment[,] is valid. ("Count I")." The Plaintiffs argued that the settlement constituted "an attempt to unlawfully circumvent the exclusive procedures established by the General Assembly" by effectively amending the Ordinance to incorporate the two-tiered annexation schedule, without enacting a new ordinance. Secondly, the Plaintiffs alleged that the terms of the settlement are constitutionally invalid because they "subject[] taxpayers in Areas A and B to different tax rates in violation of [article 2, section 28] of the Tennessee Constitution. ("Count II")."

In its motion to dismiss, the City argued that (1) the claims are barred by res judicata and collateral estoppel; (2) the Plaintiffs do not have standing to file a declaratory judgment action challenging the terms of a judgment to which they were not a party; (3) the complaint was untimely; and (4) the Plaintiffs failed to join indispensable parties, specifically the property owners involved in the 1997 consolidated litigation. On January 22, 2007, the trial court granted the motion to dismiss "on all grounds set forth therein."

On direct appeal, the Court of Appeals affirmed, concluding that there was "no authority to vacate the annexation ordinance based upon the . . . procedural defects" alleged by the Plaintiffs. Highwoods Props., Inc. v. City of Memphis, No. W2007-00454-COA-R3-CV, 2007 WL 4170821, at *10 (Tenn. Ct. App. Nov. 27, 2007) ("Highwoods Properties II"). The court further concluded that the Plaintiffs' constitutional claims were without merit. Id. at *14.

**Standard of Review**

A Rule 12.02(6) motion under the Tennessee Rules of Civil Procedure seeks to determine whether the pleadings state a claim upon which relief may be granted. Edwards v. Allen, 216 S.W.3d 278, 284 (Tenn. 2007). Such a motion tests only the legal sufficiency of the complaint, not the strength of the proof. The resolution of the motion is determined by an examination of the pleadings alone. Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 938 (Tenn. 1994) (citing Wolcotts Fin. Servs., Inc. v. McReynolds, 807 S.W.2d 708, 710 (Tenn. Ct. App.

---

[1] This opinion refers to "Area A" and "Area B" for the purposes of clarity; however, as the map shows, neither the subsections bearing "A" designations nor the subsections bearing "B" designations are contiguous. Thus, Area A is, in fact, three areas, all of which border Memphis, but none of which share borders with each other. Similarly, Area B consists of two areas, both of which border Memphis, but which do not border each other.

-4-

1990)).  For purposes of analysis, the motion contemplates that all relevant and material allegations in the complaint, even if true and correct, do not constitute a cause of action.  In considering a motion to dismiss, courts must construe the assertions in the complaint liberally; the motion cannot be sustained unless it appears that there are no facts warranting relief.  Cook, 878 S.W.2d at 938 (citing Fuerst v. Methodist Hosp. S., 566 S.W.2d 847, 848-49 (Tenn. 1978)).  On appeal, all allegations of fact by the Plaintiffs must be taken as true.  Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997).  Our scope of review is de novo with no presumption of correctness.  Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008); Owens v. Truckstops of Am., 915 S.W.2d 420, 424 (Tenn. 1996).

When called upon to construe a statute, we must first ascertain and then give full effect to the General Assembly's intent and purpose.  Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008).  Our chief concern is to carry out the legislature's intent without either broadening or restricting the statute beyond its intended scope.  Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).  Every word in a statute "is presumed to have meaning and purpose, and should be given full effect if so doing does not violate the obvious intention of the Legislature."  In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005) (quoting Marsh v. Henderson, 424 S.W.2d 193, 196 (Tenn. 1968)).  When the statutory language is clear and unambiguous, we apply its plain meaning without complicating the task.  Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004).  When a statute is ambiguous, however, we may reference the broader statutory scheme, the history of the legislation, or other sources to discern its meaning.  Parks v. Tenn. Mun. League Risk Mgmt. Pool, 974 S.W.2d 677, 679 (Tenn. 1998).  We presume that the General Assembly was aware of its prior enactments and knew the state of the law at the time it passed the legislation.  Owens, 908 S.W.2d at 926.

**Analysis**

The Plaintiffs have presented two arguments in support of their claim for declaratory relief.  As Count I, they argue that the consent judgment entered in the earlier settlement of the *quo warranto* suits amounts to an impermissible, non-legislative amendment of the ordinance.  As Count II, the Plaintiffs allege that the consent judgment, if otherwise valid, imposes a system of taxation that violates article II, section 28 of the Tennessee Constitution.  The City has disputed both the substance of these arguments and the Plaintiffs' authority to initiate the declaratory judgment suit under these circumstances.

**Count I**

The Plaintiffs argue that the Declaratory Judgment Act permits a challenge to the terms of the 2006 consent judgment, which, they claim, revises the Ordinance.  In response, the City maintains that permitting an action for declaratory judgment by the Plaintiffs on this count, despite their failure to file a timely *quo warranto* challenge eleven years ago, would circumvent the intent of the General Assembly and the longstanding policy of this state limiting the power of courts to intercede in the annexation process. Our resolution of this question requires a close analysis of the historical role of courts in reviewing annexations, as well as the relevant statutes and constitutional

provisions.

## I. Background

In Hunter v. City of Pittsburgh, 207 U.S. 161 (1907), the United States Supreme Court considered the efforts of citizens and taxpayers of Allegheny, Pennsylvania – as well as the City of Allegheny itself – to block the consolidation of Allegheny with the larger City of Pittsburgh. Allegheny and its citizenry raised a number of objections to the consolidation, including claims that it violated the United States Constitution, both as an unlawful impairment of the obligations of contracts under Article I, Section 10, and as a deprivation of property without due process of law under the Fourteenth Amendment. Id. at 176-77. After the Supreme Court of Pennsylvania addressed the relevant state law claims, see In re City of Pittsburg, 66 A. 348 (Pa. 1907), the United States Supreme Court considered the federal constitutional challenge:

> Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. . . . The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. . . . The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States.

Hunter, 207 U.S. at 178-79 (emphasis added).

Municipalities[2] have a similar historical status under our state constitution. "[I]t was held at an early day that the Legislature had complete control of municipal corporations, and may abolish them at any time in its discretion." Smiddy v. City of Memphis, 203 S.W. 512, 513 (Tenn. 1918) (citing Luehrman v. Taxing Dist. of Shelby County, 70 Tenn. 425 (1879) (upholding private act abolishing charter of the City of Memphis)); see also Caldwell v. Harris, 204 S.W.2d 1019, 1022-23 (Tenn. 1947) (upholding private act abolishing Town of Butler and liquidating its assets); City of Memphis v. Memphis Water Co., 52 Tenn. (5 Heisk.) 495, 527 (1871) ("[M]unicipal . . . franchises are always subject to the control of the legislative power for the purpose of amendment, modification, or entire revocation."). In Stocker v. City of Nashville, this Court described the nature of a municipality as follows:

---

[2] This Court has remarked that "we are not convinced that there is an ordinary meaning" for the term "municipality." Chapman v. Sullivan County, 608 S.W.2d 580, 582 (Tenn. 1980). For the purposes of this opinion, "municipality" refers to a municipal corporation and its boundaries.

> A municipal corporation is a political, or governmental, agency of the state, which has been constituted for the local government of the territorial division described[,] and which exercises, by delegation, a portion of the sovereign power for the public good. In its organization, and in the assignment of its powers and duties, the Legislature acts supremely.

126 S.W.2d 339, 340 (Tenn. 1939) (quoting MacMullen v. Middletown, 79 N.E. 863, 864 (N.Y. 1907)). We have therefore held that "[i]t is elementary that the Legislature . . . may give and take away as it chooses [a municipality's] powers and privileges." First Suburban Water Util. Dist. v. McCanless, 146 S.W.2d 948, 950 (Tenn. 1941).

Traditionally, the power to alter the boundaries of a municipality has been viewed as a natural result of the legislature's broader power to establish and abolish municipal corporations: "To hold that the legislature could not enlarge the corporate limits by an act passed for that purpose would be to deny that it could create or abolish; for the greater includes the lesser in law, as in mathematics." Williams v. City of Nashville, 15 S.W. 364, 365 (Tenn. 1891). Thus, "[t]he unlimited power of the Legislature to change municipal boundaries [was] declared by this Court so many times for so many years that there could have been no doubt in the legislative mind as to the validity of" its power to enlarge municipal boundaries. Bell v. Town of Pulaski, 184 S.W.2d 384, 386 (Tenn. 1945). The power of the legislature to change municipal boundaries was not only unlimited but also exclusive. Willett v. Corp. of Bellville, 79 Tenn. 1, 5 (1883) ("The boundaries of a municipal corporation as fixed by the Legislature . . . can not be changed except by the Legislature, or in the mode specifically prescribed by the Legislature."). Moreover, an individual subject to a validly-enacted annexation had no legal avenue through which to oppose it: "[t]he extension of the corporate limits of [a municipality] was an exercise of governmental power of which the persons newly taken in could not be heard to complain; they had no voice in the matter, no power to resist, nor was any legal right of theirs infringed thereby." McCallie v. Mayor & Alderman of Chattanooga, 40 Tenn. (3 Head) 317, 321 (1859).

Until 1955, the primary method in Tennessee for annexation of new territory to the borders of a municipality was by private act of the General Assembly. Wallace Mendelson, Suggestions for the Improvement of Municipal Annexation Law, 8 Vand. L. Rev. 1, 3 (1954); Joe M. Looney, Note, Municipalities—Judicial Review of Annexation, 36 Tenn. L. Rev. 825, 825 (1969); see also Hamilton County v. City of Chattanooga, 310 S.W.2d 153, 154-55 (Tenn. 1958). In 1953, however, a limited constitutional convention proposed – and voters adopted – article XI, section 9 of the Tennessee Constitution, including the provision that has come to be known as the "municipal boundaries clause." Frederic S. Le Clercq, Tennessee Annexation Law: History, Analysis, and Proposed Amendments, 55 Tenn. L. Rev. 577, 580-82 (1988). The clause appears alongside identical restrictions on the creation, merger, consolidation, and dissolution of municipalities: "The General Assembly shall by general law provide the exclusive methods by which municipalities may be created, merged, consolidated and dissolved and by which municipal boundaries may be altered." Tenn. Const. art. XI, § 9 (emphasis added).

Cecil Sims, a delegate to the 1953 convention, characterized this portion of article XI, section 9 as the product of a "fight for the removal of . . . [a] cancer from the body politic" – the cancer being the misuse of private acts against municipal governments. Journal and Proceedings of the 1953 Limited Constitutional Convention 910. As an example of the exploitation of the legislative prerogative, Sims recounted the dissolution of the City of Memphis by private act in 1879:

> And consider . . . our great sister City of Memphis, with all of its fine people and all of its horses and wagons, and all of its fire engines, and all of its public property was abolished as a municipality and the property it owned, and its people were transferred to the State of Tennessee . . . and the great City of Memphis having been robbed of its property paid for by the sweat and toil of its taxpayers, was humiliated by having its property sequestered to the State . . . .

Id. (discussing Act of Jan. 29, 1879, 1879 Tenn. Acts 13); see also id. at 911 ("On three successive occasions, the Charter of the City of Nashville was completely repealed and replaced by another Charter, resulting from a factional fight in city politics, and enacted by the means of local legislation over the protests of the people . . . ."). Under the municipal boundaries clause, Sims explained, municipalities would be shielded from boundary alterations by private act just as they would be shielded from dissolution by private act. Id. at 907 ("[O]n the somewhat perplexing questions of extension of city boundaries, the creation of municipalities where none existed before, the merging of cities and the consolidation and dissolution of municipalities, the exclusive power to govern . . . is left in the General Assembly, to be implemented by general legislation."); see also Frost v. City of Chattanooga, 488 S.W.2d 370, 373 (Tenn. 1972) ("The Journal of th[e] Limited Constitutional Convention reflects in detail the great evils that had arisen in regard to the Legislature enacting legislation affecting only one county or municipality. In order to remedy such evils, the language here relied upon and other language of Article 11, Section 9 was proposed by the Convention and adopted by the people.").

The legislature employed the authority granted under article XI, section 9 to enact chapter 113 of the public acts of 1955 (the "1955 Act"), establishing a general law governing the annexation of land to the borders of existing municipalities. The 1955 Act provided for three mechanisms of annexation: (1) a single referendum by the voters in the area to be annexed, Act of Mar. 1, 1955, § 3, 1955 Tenn. Pub. Acts 382, 384-85 (codified as amended at Tenn. Code Ann. §§ 6-51-104, -105 (2005));  (2) two concurrent referenda by, on the one hand, voters in the area to be annexed and, on the other, voters within the annexing municipality, both of which must be successful to establish annexation, id.; and (3) an ordinance of the annexing municipality, id. § 2 (codified as amended at Tenn. Code Ann. § 6-51-102 (Supp. 2008)).

The third of these methods – annexation by ordinance of the annexing municipality – has been described as "[t]he most innovative aspect of the 1955 Act," Le Clercq, 55 Tenn. L. Rev. at 583, and a "radical change" from prior law, Hamilton County, 310 S.W.2d at 154. This Court later explained the rationale for allowing a municipality to annex new territory on its own initiative:

The whole theory of annexation is that it is a device by which a municipal corporation may plan for its orderly growth and development. Heavily involved in this is control of fringe area developments and zoning measures to the end that areas of unsafe, unsanitary and substandard housing may not "ring" the City to the detriment of the City as a whole. In a word, annexation gives a city some control over its own destiny. The preservation of property values, the prevention of the development of incipient slum areas, adequate police protection within a metropolitan area, and the extension of city services to [t]hose who are already a part of the city as a practical proposition, are the legitimate concern of any progressive city.

City of Kingsport v. State ex rel. Crown Enters., Inc., 562 S.W.2d 808, 814 (Tenn. 1978) (emphasis added). This decision of the General Assembly to vest annexation power in municipalities themselves reflects the "perfectly obvious" conclusion "that the city fathers would know far more about the needs and necessity of annexation than would the Legislature." State ex rel. Senff v. City of Columbia, 343 S.W.2d 888, 889 (Tenn. 1961).

The context of the passage of the 1955 Act reveals a corresponding intent by the General Assembly to increase the power of municipalities to deal with developments on their peripheries. The first decade following the Second World War had been marked by a major rise in public interest in the abilities of cities to cope with growth immediately outside their borders.[3] Robert Bruegmann, Sprawl: A Compact History 121 (paperback ed. 2006). This rise in concern was typified in

---

[3] The 1955 Act was not the only high-profile step taken by the General Assembly during the post-War decade to answer growing concerns about the management of development outside the borders of cities. In 1951, the General Assembly passed a private act creating a commission to investigate problems arising from the sizable population living within the Nashville metropolitan area but outside the city's borders. Act of Feb. 19, 1951, 1951 Tenn. Private Acts 665. The act, signed by Governor Browning, explained that "the great concentration of people and their homes, institutions and enterprises occupying the central portion of Davidson County constitute substantially one community and have a common need for those services and facilities customarily supplied by a local government formed for such purposes." Id. However, the act observed, "less than half of the area and less than two-thirds of the population comprising this community are served by such a local government, the remaining area and population being dependent upon the County Government which is not constituted nor intended to render such services." Id. at 665-66. The resulting report concluded that "Nashville cannot hope to grow, nor can it safely expect to hold its own, while obsolete City limits exclude over 90,000 urban dwellers and constitute a paralyzing strait-jacket on the community's economic progress." Cmty. Servs. Comm'n for Davidson County and the City of Nashville, A Future for Nashville: A Report 3 (1952). The effort spurred by the 1951 private act culminated in the effective consolidation of the governments of the City of Nashville and its surrounding county – creating what is today referred to as the Metropolitan Government of Nashville and Davidson County, Tennessee. See Metro. Gov't of Nashville & Davidson County, Tenn., Charter §§ 1.01, 1.02; Frazer v. Carr, 360 S.W.2d 449 (Tenn. 1962) (upholding consolidation of the city and county governments); State ex rel. Schmittou v. City of Nashville, 345 S.W.2d 874, 878 (Tenn. 1961) (describing efforts associated with the 1951 private act); Carole Stanford Bucy, The anniversary of Metropolitan government is worth celebrating, Tennessean (Nashville), Apr. 1, 2008 (online ed.) ("The idea of complete consolidation first surfaced in a report, A Future for Nashville, published in 1952 by the Community Services Commission . . . . It did not receive much attention until County Judge Beverly Briley endorsed the idea in a speech to the Rotary Club three years later.").

Tennessee by a law review article in which Wallace Mendelson argued that the state's law of municipal annexation was inadequate to the problems faced by cities. Mendelson, 8 Vand. L. Rev. at 3-4. The article provided model statutory sections to establish new methods of annexation. Id. at 13-18. Professor Mendelson's suggestions were apparently considered and, in part, modified and adopted by the General Assembly in the drafting of the 1955 Act. See Hamilton County, 310 S.W.2d at 155 ("[O]bviously the draftsman [of the 1955 Act] had the benefit of Professor Mendelson's article, as much of the phraseology is identical; else this is the greatest coincidence since John Adams and Thomas Jefferson died on the same day."); Central Soya Co. v. City of Chattanooga, 338 S.W.2d 576, 577 (Tenn. 1960) (citing Mendelson, 8 Vand. L. Rev. 1, and stating that the 1955 Act was passed "with the above in mind"). Specifically, the 1955 Act's provisions permitting annexation by ordinance appear to be based in significant part on the second of Professor Mendelson's four proposals. Compare Act of Mar. 1, 1955, § 2 with Mendelson, 8 Vand. L. Rev. at 15-16.

The 1955 Act granted "[a]ny aggrieved owner of property lying within territory which is the subject of an annexation ordinance" a right to challenge the ordinance via a timely filed *quo warranto* action alleging that the annexation "reasonably may not be deemed necessary for the welfare of the residents and property owners of the affected territory and the municipality as a whole and so constitute[s] an exercise of power not conferred by law."[4] Act of Mar. 1, 1955, § 2(b). In Morton v. Johnson City, this Court narrowly construed the scope of judicial review in such a challenge:

> [I]f it is a fairly debatable question as to whether or not the ordinance is reasonable or unreasonable[,] the courts certainly are not going to take any hand in it one way or the other. . . . [If the question is, as a matter or law, fairly debatable,] the court should take the matter away from the jury and conclude in favor of the ordinance.

333 S.W.2d 924, 930-31 (Tenn. 1960). In the ensuing years, the Court repeatedly cited Morton for the proposition that, if the reasonableness of an annexation is fairly debatable, then any *quo warranto* action in opposition must fail and the annexation be permitted to move forward. State ex rel. Spoone v. Mayor of the Town of Morristown, 431 S.W.2d 827, 829 (Tenn. 1968); State ex rel. Robbins v. City of Jackson, 403 S.W.2d 304, 306 (Tenn. 1966); State ex rel. Hardison v. City of Columbia, 360 S.W.2d 39, 41-42 (Tenn. 1962); State ex rel. Cathey v. City of Knoxville, 364 S.W.2d 912, 913 (Tenn. 1962); State ex rel. Campbell v. Mayor of the Town of Morristown, 341 S.W.2d 733, 734-35 (Tenn. 1960).

In 1974, the General Assembly enacted a series of amendments to the 1955 Act (the "1974 Amendments"), including a new provision establishing that, in a *quo warranto* challenge to an annexation ordinance, "[t]he municipality shall have the burden of proving that an annexation

---

[4] "The propriety of *quo warranto* as a remedy for attacking the legality of municipal annexation proceedings has often been affirmed by the courts." 18 A.L.R.2d 1255, Proper remedy or procedure for attacking legality of proceedings annexing territory to municipal corporation, § 7 (Westlaw 2009). The 1955 Act was intended to "mesh in" some, but not all, of the provisions associated with *quo warranto* actions. State ex rel. Southland v. Town of Greeneville, 297 S.W.2d 68, 71 (Tenn. 1956).

ordinance is reasonable for the overall well-being of the communities involved." Act of Mar. 28, 1974, § 4, 1974 Tenn. Pub. Acts 1111, 1113 (codified at Tenn. Code Ann. § 6-51-103(c) (2005)). This section of the 1974 Amendments "destroyed all presumptions of validity and demolished the 'fairly debatable' rule" established by Morton. Crown Enters., Inc., 562 S.W.2d at 812; see also Pirtle v. City of Jackson, 560 S.W.2d 400, 401 (Tenn. 1977). Moreover, in State ex rel. Moretz v. City of Johnson City, 581 S.W.2d 628, 631-32 (Tenn. 1979), this Court concluded that a challenge to the reasonableness of an annexation in *quo warranto* included the entitlement to a trial by jury, a development that, as a practical matter, had a significant adverse effect upon the expansion of municipal territories.[5]

In 1998 (shortly after the City of Memphis enacted Ordinance No. 4513 in regard to the annexation of Area 42) the General Assembly adopted additional amendments further refining the procedures for annexation and *quo warranto* challenges. Act of May 1, 1998, 1998 Tenn. Pub. Acts 1157 (the "1998 Amendments"); see also State ex rel. Tipton v. City of Knoxville, 205 S.W.3d 456, 465-68 (Tenn. Ct. App. 2006) (upholding constitutionality of 1998 Amendments), perm. app. denied (Tenn. 2006).[6] Under the 1998 Amendments, local governments in each county adopt a comprehensive growth plan identifying "urban growth boundaries," "planned growth areas," and "rural areas" therein. Act of May 1, 1998, §§ 1, 5 (codified as amended at Tenn. Code Ann. § 6-58-101, -104 (2005)). A municipality may annex an area within its urban growth boundaries using methods established by the 1955 Act, and a property owner challenging that annexation via a *quo warranto* proceeding will bear the burden of showing that the annexation "is unreasonable for the overall well-being of the communities involved" or that "[t]he health, safety, and welfare of the citizens and property owners of the municipality and territory will not be materially retarded in the absence of such annexation." Act of May 1, 1998, § 12(a) (codified as amended at Tenn. Code Ann. § 6-58-111(a) (Supp. 2008)). Moreover, the case will be heard without a jury. Tenn. Code Ann. § 6-58-111(b). If, however, the municipality wishes to annex an area outside its growth boundaries, it must either propose an amendment to the growth plan or rely on the referendum annexation method. Act of May 1, 1998, § 12(c)-(d) (codified as amended at Tenn. Code Ann. § 6-58-111(c)-(d) (2008)). Thus, the 1998 Amendments reflect a balance. While, on one hand, the new restrictions

---

[5] One legal scholar described Moretz and the 1974 Amendments as, respectively, "the most devastating judicial and legislative blows to municipal annexation in the . . . history of the 1955 Act," with Moretz being "probably the more ruinous of the two" because it "makes municipal annexation hostage to the caprice of even a *single* hold-out juror." Le Clercq, 55 Tenn. L. Rev. at 639.

[6] The 1998 Amendments were drafted to create a statutory scheme that:

(1) Eliminates annexation or incorporation out of fear;
(2) Establishes incentives to annex or incorporate where appropriate;
(3) More closely matches the timing of development and the provision of public services;
(4) Stabilizes each county's education funding base and establishes an incentive for each county legislative body to be more interested in education matters; and
(5) Minimizes urban sprawl.

Act of May 1, 1998, § 3 (codified as amended at Tenn. Code Ann. § 6-58-102 (2005)).

discourage annexations that extend beyond a city's predicted area of growth, on the other, the 1998 Amendments assure that a municipality will not bear the burden of proof in a *quo warranto* challenge when it does exercise its power within predicted boundaries. See Tipton, 205 S.W.3d at 460 (discussing "significant differences" in *quo warranto* procedures under the 1998 Amendments and the "older framework").

## II. The Plaintiffs' Cause of Action

The Plaintiffs do not dispute that they failed to file a timely *quo warranto* challenge. This issue was resolved by the Court of Appeals in Highwoods Properties I, 2006 WL 3628102, at *7. Instead, the Plaintiffs argue that they now have a cause of action under the Declaratory Judgment Act to challenge what they have characterized as the "amendment" of the annexation ordinance by the 2006 consent judgment.[7] We disagree.

Under the principles of our constitution, the General Assembly "could have delegated to the municipalities the authority to annex with no right of judicial review absent constitutional restraint." Bastnagel, 457 S.W.2d at 534. The right to challenge an annexation is thus a "statutory right" that "in its very origin is limited." Brent v. Town of Greeneville, 309 S.W.2d 121, 123 (Tenn. 1957). We have stated that "[w]ithin the four corners of [the *quo warranto*] statute lies the entire jurisdiction and authority of the Courts to review the actions of municipalities in enacting annexation ordinances." City of Oak Ridge v. Roane County, 563 S.W.2d 895, 897 (Tenn. 1978). Thus, "the courts have no power to vacate an annexation ordinance for purely procedural defects," because no such authority has been granted by statute. City of Watauga v. City of Johnson City, 589 S.W.2d 901, 906 (Tenn. 1979). Rather, the general rule is that defects in an annexation ordinance must be presented in the context of a challenge to its reasonableness or necessity by way of a timely *quo warranto* challenge. City of Oak Ridge, 563 S.W.2d at 898; see also City of Knoxville v. State ex rel. Graves, 341 S.W.2d 718, 721 (Tenn. 1960) (holding that allegation that ordinance was passed without a public hearing "should be considered in connection with the question of the reasonableness of the ordinance").

In State ex rel. Earhart v. City of Bristol, however, we recognized an exception (other than a constitutional challenge) to the rule and held that, in certain situations where no *quo warranto* action is statutorily available, it is permissible to challenge an ordinance's validity with a declaratory judgment action. 970 S.W.2d at 953. In Earhart the validity of an ordinance enacted several years

---

[7] A declaratory judgment action is a relative novelty in the law. Snow v. Pearman, 436 S.W.2d 861, 863 (Tenn. 1968) (observing that "the declaratory judgment procedure does not come to the jurisprudence of Tennessee from antiquity"). The common law did not allow a suit in either law or equity absent an actual and present injury. Clein v. Kaplan, 40 S.E.2d 133, 137 (Ga. 1946). In recent years, however, declaratory judgment actions have gained popularity as a proactive means of preventing injury to the legal interests and rights of a litigant. See Colonial Pipeline, 263 S.W.3d at 836-37 (discussing history of declaratory judgments). In its present form, the Tennessee Declaratory Judgment Act grants courts of record the power to declare rights, status, and other legal relations. Tenn. Code Ann. § 29-14-102(a) (2000). The Act also conveys the power to construe or determine the validity of any written instrument, statute, ordinance, contract, or franchise, provided that the case is within the court's jurisdiction. Tenn. Code Ann. § 29-14-103 (2000). "[W]hether to entertain a declaratory judgment action is, in certain situations, largely discretionary with the trial judge." State ex rel. Earhart v. City of Bristol, 970 S.W.2d 948, 954 (Tenn. 1998).

earlier was challenged because the annexed area contained no "people, private property, or commercial activity." Id. at 954; see State ex rel. Collier v. City of Pigeon Forge, 599 S.W.2d 545, 547 (Tenn. 1980) ("[L]ong and lean . . . annexations, so long as they take in people, private property, or commercial activities and rest on some reasonable and rational basis, are not per se to be condemned." (emphasis added)). Annexations containing no people, private property, or commercial activities, by necessity, cannot be challenged in a *quo warranto* action, because only an "aggrieved owner of property that borders or lies within territory that is the subject of an annexation ordinance prior to the operative date thereof" may file such a challenge. Tenn. Code Ann. § 6-51-103(a)(1)(A) (emphasis added). We held, therefore, that the action for declaratory judgment was permissible, but limited our holding in two key ways. First, we permitted only challenges to ultra vires acts, that is, tests of "[t]he validity of an annexation ordinance alleged to exceed the authority delegated by the legislature." Earhart, 970 S.W.2d at 954. Second, we stated that it is only "where the *quo warranto* proceeding is not available, [that] alternative equitable remedies are not barred." Id. at 952 (citing 65 Am. Jur. 2d Quo Warranto § 7 (1972) ("[W]here the remedy by *quo warranto* is available, it is usually held that there is no concurrent remedy in equity, unless by virtue of statutory provision.")) (emphasis added).

While citing Earhart as authoritative support for their contentions, the Plaintiffs have failed to overcome either of the barriers identified in that case. As an initial matter, they have neither raised a colorable claim that the Ordinance is void, nor, despite their protestations to the contrary, challenged any specific augmentation of the Ordinance. Reduced to its essence, the challenge by the Plaintiffs is to a single aspect of the court's approved settlement of the earlier lawsuit attacking the reasonableness of the Ordinance; that is, the City's consent to delay the planned annexation of Area B until 2013. A delay in the effective date of the annexation fits more neatly within the classification of procedural defects, as defined by City of Oak Ridge and City of Watauga – issues that we held must be presented in a *quo warranto* proceeding and considered in the context of the reasonableness of the annexation. We completely agree with the assessment of the Court of Appeals that our limited holding in Earhart did not overrule the longstanding principle, articulated in those cases, that Tennessee courts have no authority to vacate an annexation based on procedural defects, except insofar as those defects bear on the questions presented in a timely *quo warranto* action.

Moreover, the Plaintiffs cannot avail themselves of Earhart because they, unlike the claimants in Earhart, could have filed a timely *quo warranto* challenge.[8] "Subject to some exceptions, a declaratory judgment action should not be considered where special statutory proceedings provide an adequate remedy." Colonial Pipeline, 263 S.W.3d at 838 (citing Katzenbach v. McClung, 379 U.S. 294, 296 (1964)). If the Plaintiffs had filed a timely *quo warranto* challenge, their cause of action would have been consolidated with the other timely-filed challenges pursuant to Tennessee Code Annotated section 6-51-103(d). The Plaintiffs, as parties in a single, consolidated *quo*

---

[8] It appears from the record that the Plaintiffs owned property in the annexation area at the time the Ordinance was enacted. Even if they had acquired the property later, however, it is of no consequence. An individual who acquires title to land within an annexation area after the time period for a challenge has expired is not entitled to a new cause of action.

*warranto* case, would have had a seat at the table throughout the litigation and could have rejected any offer of settlement by the City. Indeed, the allegations in the Highwoods Properties I complaint effectively confirm that, if they had filed a timely *quo warranto* challenge, they would have been able to prevent the adoption of any "especially detrimental" terms within the consent judgment. The Plaintiffs – having allowed their special statutory cause of action to expire – are not entitled to a second bite of the apple under the Declaratory Judgment Act.

The *quo warranto* procedures established by the General Assembly are the product of over half a century of experience and reflect a careful balance between the interests of municipalities and the concerns of individuals who object to the annexation of their property. This legislative remedy "avoid[s] the specter of numerous successive suits by private parties attacking the validity of annexations," "because the judgment settles the validity of the annexation on behalf of all property holders in the affected area." Earhart, 970 S.W.2d at 952 (quoting Alexander Oil Co. v. City of Seguin, 825 S.W.2d 434, 437 (Tex. 1991)). To sustain the propriety of this litigation would permit the piecemeal litigation that the *quo warranto* procedures are designed to prevent. We do not believe that the General Assembly intended to permit such a result. Thus, the Court of Appeals' holding on Count I must be affirmed.

**Count II**

As a preliminary matter, we agree with the Court of Appeals that Count II, unlike Count I, is a proper question for the courts. "The importance of correctly resolving constitutional issues suggests that constitutional issues should rarely be foreclosed by procedural technicalities." Colonial Pipeline, 263 S.W.3d at 844-45 (quoting In re Adoption of Female Child, 42 S.W.3d 26, 32 (Tenn. 2001)). The stringent restrictions on any challenge to an annexation apply only when constitutional issues are not at stake. See City of Oak Ridge, 563 S.W.2d at 897 ("[A]bsent constitutional infirmities, the rights that now exist are limited to those granted in Section 2(b) of that act, codified in T.C.A. § 6-310, grammatical paragraphs one, three, and four." (emphasis added)). Moreover, the Plaintiffs' allegations in Count II challenge the taxation scheme incident to the annexation and not the propriety of the annexation itself.

The Plaintiffs argue that the consent judgment approving the annexation, even if otherwise valid, establishes a system of taxation that contravenes the equality and uniformity requirements of article II, section 28 of the Tennessee Constitution, because it permits the City to levy a municipal tax on the inhabitants of Area A while, at the same time, levying no corresponding tax on the inhabitants of Area B. The Court of Appeals rejected the argument:

> [Plaintiffs'] complaint that they are forced to pay City of Memphis taxes for a longer period than other property owners, whose land is not yet part of the City, does not implicate the "equal and uniform clause" of Article II, Section 28. . . . There is nothing in the record to suggest that the City of Memphis or any other taxing authority is implementing different tax rates within its own borders. Area B will not be annexed into the city limits of Memphis until 2013, so it is not necessary that Area A and Area B property be taxed at the same rate at this time. They are currently in

different jurisdictions for purposes of this analysis.

Highwoods Properties II, 2007 WL 4170821, at *12.

## I. Background

The relevant language of article II, section 28 of the Tennessee Constitution provides that "[e]ach respective taxing authority shall apply the same tax rate to all property within its jurisdiction." This language was adopted by a 1971 constitutional convention and approved by general election on August 3, 1972. See generally Sherwood Co. v. Clary, 734 S.W.2d 318, 320 (Tenn. 1987) ("Article 2, § 28, of the Tennessee Constitution was extensively revised by an amendment adopted in 1972."); Snow v. City of Memphis, 527 S.W.2d 55, 58 (Tenn. 1975) (discussing history of the 1972 amendment of section 28); So. Ry. Co. v. Fowler, 497 S.W.2d 891, 893 (Tenn. 1973) (same). Prior to 1972, however, the Constitution of 1870 imposed a similar restriction. Article II, section 28 required that "[a]ll property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that taxes shall be equal and uniform throughout the state." See Albert v. Williamson County, 798 S.W.2d 758, 759 n.1 (Tenn. 1990). Article II, section 29 of the 1870 Constitution applied this restriction to taxation by municipalities:

> The General Assembly shall have power to authorize the several counties and incorporated towns in this state, to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to state taxation.

Albert, 798 S.W.2d at 760 (emphasis added). These provisions, read together, "require that there shall be uniformity of valuation and assessment of property for purposes of taxation, and that the tax levy for any given purpose shall be uniform throughout the territory to which it is applied." King v. Sullivan County, 160 S.W. 847, 848 (Tenn. 1913); see also Earnest v. Greene County, 198 S.W. 417, 418 (Tenn. 1917).

Over one hundred years ago, the Court concluded that a private act annexing new territory to the City of Memphis, but exempting the newly-annexed area from certain city taxes for a ten-year period, violated sections 28 and 29 of article II of the 1870 Constitution:

> This court is of opinion that sections 3 and 4 of chapter 6 are clearly unconstitutional and void, inasmuch as they exempt the annexed territory from taxes for fire, light, and police protection for 10 years, and for the same time expressly prohibit the district from having the advantages of this protection. The court is of opinion that taxation must always be uniform and equal throughout the extent of the same jurisdiction; that state taxes must be equal and uniform throughout the state; that county taxes must be equal and uniform throughout the county; and that a city tax must be equal and uniform throughout the city, so far as revenues for current

-15-

expenses or future wants are concerned . . . .

Jones v. City of Memphis, 47 S.W. 138, 139 (Tenn. 1898).  In many contexts, "the [amended] language of the equal and uniform clause has the same meaning as the 1870 version."  Albert, 798 S.W.2d at 761; but see Sherwood Co., 734 S.W.2d at 320 (discussing effect of amendment on application of equal and uniform clause to different classifications of property).

## II. Equality and Uniformity of Taxation in Area 42

The Plaintiffs insist that the terms of the consent judgment permit the City to impose a scheme of taxation in direction violation of Jones.  They base their claim on the following language in section 6-51-103(d):

> Should the court find the ordinance to be unreasonable, or to have been done by exercise of powers not conferred by law, an order shall be issued vacating the ordinance and the municipality shall be prohibited from annexing, pursuant to the authority of § 6-51-102, any part of the territory proposed for annexation by such vacated ordinance for a period of at least twenty-four (24) months following the date of such order. In the absence of such finding, an order shall be issued sustaining the validity of such ordinance, which shall then become operative thirty-one (31) days after judgment is entered unless an abrogating appeal has been taken therefrom.

Tenn. Code Ann. § 6-51-103(d) (emphasis added).  While acknowledging that the language in the consent judgment provides otherwise, the Plaintiffs contend that both Areas A and B became part of the City thirty-one days after the entry of that judgment, because, by the terms of this statute, the entire ordinance had become "operative."  Because both areas have been annexed by the terms of the legislation, but only Area B is subject to city taxes, the Plaintiffs argue that an unequal taxing scheme is the result.

This argument rests on a faulty assumption that there is no difference between the effective date of the ordinance and the effective date of the annexation.  In our view, although the entire ordinance became operative thirty-one days after the entry of the consent judgment, the very terms of that judgment also properly delay the annexation of Area B until a later date.  See Bastnagel, 457 S.W.2d at 534-35 (holding that the date on which an annexation ordinance becomes operative is not necessarily "the actual date of annexation").  The actual date of annexation for Area B has been merely postponed by a term contained within the judgment approved by the trial court as reasonable under the circumstances.[9]  As stated, the Plaintiffs may not contest this portion of the consent judgment as an impermissible modification of the Ordinance.  Because Area B is not part of the City, there has been no violation of the equality and uniformity provisions of article II, section 28.

_____

[9] The Plaintiffs make a significant point of arguing that "operative" and "effective" are synonymous.  The issue in this case, however, is not whether there is a difference between an ordinance being operative and the ordinance being effective.  The issue is whether there is a difference between an ordinance being operative and a portion of the annexation described in the ordinance being effective.

-16-

Moreover, our ruling on this issue does not create the risks identified by the Court in <u>Jones</u>:

> The logical result of the contrary holding as to taxation would be that, in every city, taxes might be different in different wards, and on different streets; in every county, taxes might be different in every civil district; in the state, taxes might be different in every county, and in each division,—all clearly in violation of the constitution and our whole theory of equal and uniform taxation. So, also, it cannot be maintained that a section of territory may be brought within the city limits, and made part of the city, and yet be excluded by express enactment from the benefits extended to other portions of the city.

47 S.W. at 139. In this instance, we are not dealing with territory "brought within the city limits, and made part of the city." To uphold the system of taxation within the City in no way approves of the establishment of different levels of taxation "in different wards, and on different streets" of a municipality.

**Conclusion**

In summary, the relevant and material allegations in the Plaintiffs' complaint, even if true and correct, do not constitute a cause of action upon which relief may be granted.[10] The motion to dismiss, therefore, was properly granted. We are not empowered to reconsider the wisdom of the City's annexation of Area 42 or its consent to the terms of the 2006 judgment. Rather, we confirm Tennessee's longstanding policy, as embodied in our Constitution and statutes, that the role of the courts in the annexation process is limited. With rare exception, the appropriate avenue by which to contest an annexation and, therefore, to assure full participation in any challenges as to its propriety, is the filing of a timely action in *quo warranto*. Further, while the constitutionality of the system of taxation within a municipality may be subject to challenge under the Declaratory Judgment Act, the effect of the Ordinance at issue did not violate the terms of article II, section 28 of the Tennessee Constitution.

The judgment of the Court of Appeals is affirmed. Costs are assessed to the Plaintiffs, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

---

[10] Because we affirm the trial court's decision on the above-stated grounds, we are not required to address the additional questions raised by the City: whether dismissal was warranted by the Plaintiffs' failure to join indispensable parties in their suit; whether the Plaintiffs had standing under the Declaratory Judgment Act; and whether the Plaintiffs' complaint was barred by the doctrines of res judicata and collateral estoppel.