# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
## February 4, 2014 Session

## SUSAN E. RICH ET AL. v. THE CITY OF CHATTANOOGA ET AL.

### Appeal from the Chancery Court for Hamilton County
### No. 12-0634      W. Frank Brown, III, Chancellor

---

### No. E2013-00190-COA-R3-CV-FILED-APRIL 17, 2014

---

This case presents the issue of whether citizens who reside on real property that is proposed for deannexation by a municipal ordinance may, pursuant to Tennessee Code Annotated § 6-51-201 (2011), properly bring a *quo warranto* or declaratory judgment action against the municipality to challenge adoption of the deannexation ordinance. The trial court dismissed these claims against the municipality, and the plaintiffs have appealed. The plaintiffs have also taken issue with the propriety of the trial court's determination regarding who would be qualified to vote in the referendum election, as well as other procedural and evidentiary issues. Discerning no error, we affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

John P. Konvalinka and David C. Higney, Chattanooga, Tennessee, for the appellants, Susan E. Rich, Janis S. Burger, and Carole Klimesch.

Phillip A. Noblett and Keith J. Reisman, Chattanooga, Tennessee, for the appellee, City of Chattanooga.

J. Christopher Clem, Chattanooga, Tennessee, for the appellees, Hamilton County Election Commission and Commissioners.

**OPINION**

I. Factual and Procedural Background

A. The Ordinance and Petition

This action involves an attempt by the City of Chattanooga ("City") to deannex thirty-six residential lots, pursuant to Tennessee Code Annotated § 6-51-201(b). These lots are located on Cumberland Road in the Elder Mountain vicinity, which area straddles the county line dividing Marion and Hamilton Counties. The City had previously annexed this area pursuant to ordinances adopted by the Chattanooga City Council in 1972 and 1994.

In 2010, Brent Burks, an Elder Mountain resident, filed a complaint seeking to have his lot deannexed and claiming that the City was charging him real property taxes but not providing full municipal services. Mr. Burks's lawsuit was dismissed by the trial court, but Mr. Burks expressed his desire for deannexation of his property to City Councilman Peter Murphy in a later communication. The Chattanooga City Council ("City Council") subsequently considered an ordinance ("Ordinance"), which sought to not only deannex Mr. Burks's property but also proposed to deannex the entire Elder Mountain area, including those lots belonging to Plaintiffs Susan E. Rich, Janis S. Burger, and Carole Klimesch. All properties subject to the proposed deannexation were identified in the resolution by tax parcel number and owner.

On November 20, 2010, a public notice was published in the Chattanooga Times Free Press and read as follows:

> The City Council of the City of Chattanooga, Tennessee, will hold a public hearing in the Assembly Room at City Hall on Tuesday, November 30, 2010 at 6:00 p.m. for the purpose of hearing any person who may be affected by, or who may otherwise be interested in the proposed de-annexation of certain properties located on Elder Mountain, previously annexed by the City of Chattanooga, more specifically described herein below and shown by the map attached thereto, lying contiguous to the present corporate limits.

The public notice included the list of tax parcel numbers and owners listed in the resolution and also included a map of all the tax parcels proposed for deannexation as Elder Mountain properties.

In addition to the newspaper notice, the City Council mailed letters to owners of the properties proposed for deannexation via certified mail. The letters stated:

-2-

This letter will serve as notice to you regarding the Elder Mountain de-annexation. The City Council is considering the de-annexation of several properties adjacent to Elder Mountain on November 30, 2010, at 6:00 p.m. in the Assembly Room at City Hall as shown in the attached notice. This matter will be published in the Chattanooga Times Free Press, but Council members instructed the City Attorney to send copies of this notice to all affected property owners by certified mail. If this de-annexation ordinance is passed, you will no longer receive services from the City of Chattanooga. You should attend this meeting to discuss any concerns regarding de-annexation that you may have with the Chattanooga City Council.

On November 30, 2010, the City Council held the noticed hearing concerning the proposed deannexation of the Elder Mountain properties. After discussion, the Ordinance was deferred for later vote. On June 28, 2011, the Ordinance was passed on first reading. Although the Ordinance is facially based on a petition for deannexation labeled Exhibit A, where "one resident residing on Elder Mountain has filed a petition with the Chattanooga City Council on November 12, 2010, requesting to be deannexed," it is undisputed that Exhibit A never existed and that no such petition was presented.

On July 12, 2011, the Ordinance was read for the second time and was passed by the City Council. The Ordinance provided that it would:

become operative seventy-five (75) days from and after its passage, pursuant to T.C.A. § 6-51-201, unless a petition objecting to deannexation signed by ten percent (10%) of the registered voters residing within the area proposed to be deannexed is filed with the Clerk of the City Council within seventy-five (75) days following the final reading of this Ordinance.

On August 25, 2011, Ms. Rich filed petitions objecting to and opposing the Ordinance, pursuant to Tennessee Code Annotated § 6-51-201(b)(3). The petitions, signed by a sufficient number of Elder Mountain residents to trigger the referendum provisions of the statute, caused the contraction issue to be placed on the ballot of the August 2, 2012 general election.

B. The Referendum Election

In preparation for the referendum election and in conjunction with the Marion County Administrator of Elections, the City established a list of voters authorized to vote on the deannexation issue. Provisions were also made to have the deannexation ballot made available to those residents eligible to vote on the issue who were registered in Marion

-3-

County. Voting took place in both Marion and Hamilton Counties during the early voting period as well as the day of the election. During early voting, Ms. Rich was told initially that she could not vote because she did not appear on the established list, but she was ultimately allowed to vote.

On election day, the Hamilton County Election Commission ("HCEC") released a document entitled "Election Summary Report," showing a vote against deannexation of 13 to 1. This document only reflected the votes from Hamilton County. The "Statement of Votes Cast" subsequently created, however, reflected the voting result of 21 to 20 in favor of deannexation. This document counted the votes from both Hamilton and Marion Counties. Before the HCEC certified the final results of the referendum election, Ms. Rich filed a complaint with the Hamilton County Chancery Court on August 15, 2012. Ms. Rich's action sought to: (1) bring a *quo warranto*[1] proceeding to challenge the Ordinance and the deannexation referendum results as constituting an exercise of power not conferred by law; (2) obtain a declaration regarding the obligations and rights of parties, or, alternatively; (3) contest the election pursuant to Tennessee Code Annotated § 29-14-101 *et seq*. and have the ordinance declared void. By agreed order, the parties and the court determined that the election contest claim would be heard separately from the *quo warranto* and declaratory judgment claims in order to comply with the statutory directive that an election contest be tried within fifty days of the filing of the respective complaint. *See* Tenn. Code Ann. § 2-17-106 (2003).

### C. The Trial

The election contest phase of trial proceeded in September 2012. The allegations against the HCEC centered on irregularities in the referendum election procedure regarding who was allowed to vote. The list of eligible voters was ostensibly determined using a Geographic Information System ("GIS") map. At the conclusion of the trial, the *quo warranto* and declaratory judgment claims were scheduled for hearing on November 15, 2012.

On November 1, 2012, the court entered an order declaring the August 2012 election void due to procedural deficiencies and directing that a new election be held. When determining who would be authorized to vote in the new election, the trial court interpreted the language of Tennessee Code Annotated § 6-51-201(b)(3), which states that if a petition is filed opposing the ordinance, "a referendum shall be held at the next general election to ascertain the will of the voters residing in the area that the city proposes to deannex." The court stated in its order, *inter alia*, that this statutory provision should be interpreted to mean

---

[1] *Quo warranto* is Latin for "by what authority." BLACK'S LAW DICTIONARY 1285 (8th ed. 2004).

that "only those persons who reside on a lot which is wholly or partially to be deannexed and are registered to vote in *either* Hamilton or Marion County" should be qualified to vote in the next election. Pursuant to a motion filed by HCEC, the trial court entered an order on November 13, 2012, directing that its previous November 1, 2012 order be deemed a final order as to the issues of the election contest and the persons who were eligible to vote in the next election. The court specifically found that there was no just reason for delay.

The *quo warranto* and declaratory judgment phase of the trial was conducted on December 17 and 20, 2012. On January 4, 2013, the trial court entered an order stating its findings and conclusions. The trial court noted that during the hearing:

> Plaintiffs wanted to pursue their declaratory judgment as to their view that only persons registered to vote in Chattanooga could vote. [In essence, Plaintiffs contended that only persons registered to vote in Hamilton County could vote. Persons registered to vote in Marion County would be excluded.] The Defendants objected to any evidence on who should or should not vote in the next contraction election as the court had already finally decided that issue and the Plaintiffs had filed a Notice of Appeal. Thus, for both reasons, the court sustained their objections.
>
> Plaintiffs' counsel was frustrated about this result because the Agreed Order of October 5, 2012, and the court's subsequent Memorandum Opinion and Order filed on November 1, 2012, both mentioned that the declaratory judgment issues and the *quo warranto* issues were bifurcated and were to be tried later. However, in order to decide whether the deannexation referendum election was valid, the court first had to decide the issue of who was eligible to vote. Thus, the voter eligibility issue was necessarily decided in the November 1, 2012 Memorandum Opinion and Order entered after trial regarding the election contest.

The trial court held that Plaintiffs waived production of any evidence regarding who should vote in the election that was not presented during the previous trial. The court also noted that it had already declared the referendum election void and that plaintiffs, in their claim for declaratory relief, had asked for a "declaration of the rights of the parties as to the validity of the ordinance and the referendum election." The court reasoned that any issues regarding the validity of the ordinance should have been addressed as part of the *quo warranto* claim. The court found, however, that the *quo warranto* claim was untimely, stating that any such claim would need to be brought within thirty days of the ordinance's final passage. Consequently, the trial court dismissed both the declaratory judgment claim and the *quo warranto* claim. Plaintiffs timely appealed.

## II. Issues Presented

The parties present the following issues for our review, which we have restated slightly:

1.    Whether the trial court erred by dismissing Plaintiffs' *quo warranto* claim, rendering moot the issue of which party had the burden of proof at trial on *quo warranto* claims in a deannexation matter.

2.    Whether the trial court erred by dismissing Plaintiffs' declaratory judgment claim and deeming as waived Plaintiffs' evidence on issues involving the parties' conduct relative to an election referendum and voting eligibility.

3.    Whether the trial court erred in its determination of qualified voters in the referendum election.

4.    Whether the trial court erred in granting HCEC's motion to bifurcate and deeming the decision on the election challenge final.

5.    Whether the trial court erred by failing to require in the Ordinance a metes and bounds description of the municipal boundaries to be deannexed.

6.    Whether the trial court erred by accepting into evidence Geographic Information System data and witnesses' testimony regarding GIS data.

7.    Whether the trial court abused its discretion by assessing forty percent of the court costs against the Plaintiffs.

## III. Standard of Review

We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. Tenn. R. App. P. 13(d); *Estate of French v. Stratford House*, 333 S.W.3d 546, 554 (Tenn. 2011). When interpreting statutes, "[o]ur primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." *Estate of French*, 333 S.W.3d at 554 (citing *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002)).

As our Supreme Court has further instructed regarding statutory construction:

[T]here are a number of principles of statutory construction, among which is

the most basic rule of statutory construction: "'to ascertain and give effect to the intention and purpose of the legislature.'" *Gleaves v. Checker Cab Transit Corp., Inc.*, 15 S.W.3d 799, 802 (Tenn. 2000) (quoting *Carson Creek Vacation Resorts, Inc. v. State Dep't. of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993)). However, the court must ascertain the intent "without unduly restricting or expanding the statute's coverage beyond its intended scope." *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993). *See also Gleaves*, 15 S.W.3d at 802; *Worley v. Weigels, Inc.*, 919 S.W.2d 589, 593 (Tenn. 1996); *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). "The legislative intent and purpose are to be ascertained primarily from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application." *State v. Blackstock*, 19 S.W.3d 200, 210 (Tenn. 2000) (citing *State v. Pettus*, 986 S.W.2d 540, 544 (Tenn. 1999)).

Courts are not authorized "to alter or amend a statute." *Gleaves*, 15 S.W.3d at 803. The reasonableness of a statute may not be questioned by a court, and a court may not substitute its own policy judgments for those of the legislature. *Id.* (citing *BellSouth Telecomm.,Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). "[C]ourts must 'presume that the legislature says in a statute what it means and means in a statute what it says there.'" *Id.* (quoting *BellSouth Telecomm.*, Inc., 972 S.W.2d at 673).

*Mooney v. Sneed*, 30 S.W.3d 304, 306-07 (Tenn. 2000).

IV. *Quo Warranto* Claim

Plaintiffs, *inter alia*, pled a claim of *quo warranto*, requesting that the trial court declare the Ordinance void *ab initio* because the City had exceeded its delegated authority by passing the Ordinance. The trial court found that the *quo warranto* action would have been the proper vehicle for allegations of this kind, had the action been timely filed. Finding the *quo warranto* action to be untimely, however, the court dismissed it. Plaintiffs now argue that the trial court erred in dismissing the *quo warranto* claim due to untimeliness. The City asserts that *quo warranto* relief is not available in cases where referendum elections serve as the check on the governmental exercise of deannexation power via ordinance. We agree with the City.

Tennessee Code Annotated § 6-51-201, which delineates guidelines for contraction of municipal boundaries, provides:

(a) Any incorporated city or town, whether it was incorporated by general or

special act, may contract its limits within any given territory; provided, that three fourths (¾) of the qualified voters voting in an election thereon assent thereto.

(b)(1) Any incorporated city or town, whether it was incorporated by general or special act, may after notice and public hearing, contract its limits within any given territory upon its own initiative by ordinance when it appears in the best interest of the affected territory.

> (2) Such contraction of limits within any territory shall not occur unless a majority of the total membership of the city legislative body approves such contraction.
>
> (3) Such contraction of limits within any territory shall not occur if opposed by a majority of the voters residing within the area to be deannexed. The concurrence of a majority of the voters shall be presumed unless a petition objecting to deannexation signed by ten percent (10%) of the registered voters residing within the area proposed to be deannexed is filed with the city recorder within seventy-five (75) days following the final reading of the contraction ordinance. If such a petition is filed, a referendum shall be held at the next general election to ascertain the will of the voters residing in the area that the city proposes to deannex. The ballot shall provide a place where voters may vote for or against deannexation by the city. If a majority of those voting in the referendum fail to vote for the deannexation, the contraction ordinance shall be void and the matter may not be considered again for two (2) years. If a majority vote for deannexation, the ordinance shall become effective upon certification of the result of the referendum.

This is the only statutory section regarding deannexation of property by a municipality.

The statutory provision allowing for a suit to be filed in the nature of *quo warranto*, however, is found in the annexation statute, *see* Tenn. Code Ann. § 6-51-103(a)(1)(A) (Supp. 2013), which provides:

> Any aggrieved owner of property that borders or lies within territory that is the subject of an *annexation ordinance* prior to the operative date thereof, may file a suit in the nature of a quo warranto proceeding in accordance with this part, § 6-51-301 and title 29, chapter 35 to contest the validity thereof on the ground

that it reasonably may not be deemed necessary for the welfare of the residents and property owners of the affected territory and the municipality as a whole and so constitutes an exercise of power not conferred by law.

(Emphasis added.)

Although we acknowledge that case law addressing the subject of deannexation is virtually nonexistent in Tennessee, we observe that there is no precedent holding that *quo warranto* is available to challenge deannexation. As this Court recognized in *City of Bluff City v. Morrell,* 764 S.W.2d 200, 202 (Tenn. 1988), wherein the Court analyzed a challenged annexation of territory, "[s]ection 6-51-201 is the only method by which such territory may . . . be deannexed." The Court proceeded to analyze the purpose of *quo warranto* in the annexation context, but it did not apply *quo warranto* in the context of deannexation. Tennessee Code Annotated § 6-51-103, detailed above, expressly provides for a *quo warranto* action to be brought to oppose annexation by ordinance. There is no corresponding statutory provision allowing for a *quo warranto* action to be brought regarding deannexation.

According to the plain language of Tennessee Code Annotated § 6-51-201, deannexation may be accomplished in one of two ways, either through an election receiving approval of three-fourths of the qualified voters or via an ordinance receiving support of a majority of the city legislative body. *See* Tenn. Code Ann. § 6-51-201(a), (b). If deannexation is initiated via ordinance, however, ten percent of citizens residing in the affected area may file a petition opposing the deannexation, and a resultant referendum election will be conducted. *See* Tenn. Code Ann. § 6-51-201(b)(3). If a majority of the voters fail to vote for deannexation, "the contraction ordinance shall be void." *Id.* This is the sole method provided by statute for review of deannexation by ordinance.

Analogously, there are two statutory procedures by which annexation can be accomplished: (1) annexation by ordinance and (2) annexation by resolution triggering a referendum election. Tenn. Code Ann. § 6-51-101 *et seq*. In the case of annexation by ordinance, courts may review whether the ordinance is a valid exercise of power in a *quo warranto* proceeding. Tenn. Code Ann. § 6-51-103. As our Supreme Court has declared, "'[w]ithin the four corners of [the *quo warranto*] statute lies the entire jurisdiction and authority of the Courts to review the actions of municipalities in enacting annexation ordinances.'" *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 708 (Tenn. 2009) (quoting *City of Oak Ridge v. Roane County*, 563 S.W.2d 895, 897 (Tenn. 1978)). The Court also noted that the right to challenge an annexation is a "statutory right" that "in its very origin is limited." *Highwoods Props.,* 297 S.W.3d at 708 (quoting *Brent v. Town of Greeneville*, 309 S.W.2d 121, 123 (Tenn. 1957)).

Utilizing the same rationale, the legislature has provided a statutory mechanism to challenge deannexation by ordinance, which is to file a petition opposing the ordinance that has been signed by ten percent of the registered voters residing in the affected area. *See* Tenn. Code Ann. § 6-51-201(b)(3). A referendum shall then be held at the next general election, and the voters shall decide the fate of the proposed deannexation. *Id.* Such is the method of review provided by the legislature, and this Court is without authority to expand this statutory remedy. *See Mooney*, 30 S.W.3d at 307.

As our Supreme Court has explained:

> When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. When a statute is clear, we apply the plain meaning without complicating the task. Our obligation is simply to enforce the written language. When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Courts must presume that a legislative body was aware of its prior enactments and knew the state of the law at the time it passed the legislation.

*Estate of French*, 333 S.W.3d at 554 (internal citations omitted).

Tennessee Code Annotated § 6-51-201 is clear and unambiguous. It provides for only one method to review the passage of a deannexation ordinance: a referendum election. Had the legislature intended for the allowance of a *quo warranto* action to challenge proposed deannexation by ordinance, the deannexation statute would have expressly provided for it. In the absence of such a provision, we cannot conclude that *quo warranto* was applicable to the Plaintiffs' claims herein. Therefore, the trial court properly dismissed the *quo warranto* claim, albeit on different grounds. *See Cont'l Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn. 1986) ("Suffice it to say that this Court will affirm a decree correct in result, but rendered upon different, incomplete, or erroneous grounds."). Other issues relating to *quo warranto* are pretermitted as moot.

V. Declaratory Judgment Claim

Plaintiffs also assert that the trial court erred in dismissing their claim seeking a declaratory judgment regarding whether the City exceeded or fulfilled its statutory authority

when it contracted its boundaries by ordinance. The trial court held that any procedural issues regarding the passage of the ordinance should have been brought in a *quo warranto* proceeding and dismissed Plaintiffs' claim seeking a declaratory judgment. Having determined that *quo warranto* is inapplicable in a deannexation proceeding, we will now address whether Plaintiffs maintain a colorable claim for declaratory judgment.

As previously explained, the annexation statute provides that a *quo warranto* action is the sole remedy for a citizen aggrieved by the passage of an annexation ordinance. *See* Tenn. Code Ann. § 6-51-101 *et seq.* Our Supreme Court has held: "[w]ithin the four corners of [the *quo warranto*] statute lies the entire jurisdiction and authority of the Courts to review the actions of municipalities in enacting annexation ordinances." *Highwoods Props.,* 297 S.W.3d at 708 (quoting *City of Oak Ridge*, 563 S.W.2d at 897). Therefore, the Court has concluded that a declaratory judgment action is not available to contest an annexation ordinance, except where the following requirements are met: (1) the challenge must relate to an *ultra vires* act, and (2) a *quo warranto* proceeding must not be available. *See Highwoods Props.,* 297 S.W.3d at 708; *see also Allen v. City of Memphis*, 397 S.W.3d 572, 581 (Tenn. Ct. App. 2012); *Cochran v. City of Memphis*, No. W2012-01346-COA-R3-CV, 2013 WL 1122803 at *5 (Tenn. Ct. App. Mar. 19, 2013). The Court further explained, "[s]ubject to some exceptions, a declaratory judgment action should not be considered where special statutory proceedings provide an adequate remedy. " *Highwoods Props.,* 297 S.W.3d at 709 (quoting *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn.2008)).

We conclude that the same rationale applies to a challenge to deannexation by ordinance. When challenging deannexation by ordinance, the statute provides for a referendum election as the only remedy. Where, as here, the statutorily provided review of a referendum election was available to and successfully utilized by Plaintiffs, and where the ordinance was invalidated by such election, there should be no further review by the courts because such further review is not specifically provided by the statute. *See, e.g., Highwoods Props.,* 297 S.W.3d at 708. Further, Plaintiffs have not alleged that the passage of this Ordinance constituted an *ultra vires* act. *See Allen*, 397 S.W.3d at 581 (explaining that where there is no allegation the City "exceeded the authority delegated by the legislature," "errors in notice, public hearings and plans of service fall within the ambit of 'procedural defects' and 'courts have no power to vacate an annexation ordinance for purely procedural defects.'"). We therefore conclude that the trial court properly dismissed Plaintiffs' claims for declaratory judgment as well.

Plaintiffs also assert that the trial court erred in reserving the *quo warranto* and declaratory judgment claims for later hearing but then "denying [Plaintiffs] an opportunity to present certain proof as to those claims." Having determined that these claims are invalid

in the present action, however, we determine this issue to be pretermitted as moot.

## VI. Determination of Qualified Voters

Plaintiffs contend that the trial court erred in making a determination concerning qualified voters in the referendum election. Plaintiffs assert that the trial court should not have decided this issue at all, and further, that the court's determination regarding who was qualified to vote was erroneous.

We note at the outset that Plaintiffs cannot properly complain to this Court regarding the fact that the trial court rendered a decision on this issue. The election contest phase of the trial was held on September 25 and 26, 2012, and a great volume of testimony was elicited by Plaintiffs' counsel regarding who should and should not have been allowed to vote in the referendum. At one point during the trial, the court commented: "One of the things I'm going to have to do sometime, as I understand it, is to determine who is a qualified voter to vote in this deannexation and who is not a qualified voter." None of the attorneys objected to the trial court's observation. Further, in his closing argument, Plaintiffs' counsel stated: "This Court has to make a determination about who are the registered voters residing within the area proposed to be deannexed."

As our Supreme Court has previously stated:

Nothing is better settled than that a "plaintiff in error will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial Court to commit, or which were the natural consequence of his own neglect or misconduct." 4 C.J. p. 700 . . . .

*Gentry v. Betty Lou Bakeries*, 100 S.W.2d 230, 231 (Tenn. 1937). In this cause, Plaintiffs clearly invited the trial court to determine who should properly vote in the referendum election at issue. Plaintiffs cannot now complain to this Court that it was improper for the trial court to make this adjudication.

We now turn to the propriety of the trial court's ultimate decision regarding who should vote in the referendum. The contraction statute, Tenn. Code Ann. § 6-51-201(b)(3), provides that contraction "shall not occur if opposed by a majority of the <u>voters residing within the area to be deannexed</u>." (emphasis added). The trial court interpreted this phrase to mean "anyone registered to vote in either Hamilton or Marion County, who resides on a lot, any part of which is part of the area to be deannexed." In making this determination, the trial court relied upon our Supreme Court's opinion in *Comm. to Oppose the Annexation of Topside & Louisville Rd. v. City of Alcoa*, 881 S.W.2d 269, 272 (Tenn. 1994).

In *Topside & Louisville Rd.*, the Court was called upon to make a determination regarding the proper interpretation of the phrase, "qualified voters who reside in the territory proposed for annexation," in relation to a referendum election pursuant to Tennessee Code Annotated § 6-51-105(a), the annexation statute. 881 S.W.2d at 270. Determining that the phrase should be interpreted broadly, the Court held that the concept of residing "in the territory proposed for annexation" would include any qualified voter who resided on property whose curtilage extended into the area proposed for annexation. *Id*. at 273. The Court defined curtilage, *inter alia*, as "the space of ground adjoining the dwelling house, used in connection therewith in the conduct of family affairs and for carrying on domestic purposes." *Id*. at 272. The Court therefore held that "those residents . . . whose curtilage extended into the territory proposed for annexation were entitled to vote in the referendum." *Id*. at 273.

The trial court applied the same principle announced in *Topside & Louisville Rd.* to the case at bar, holding that the proper interpretation of the phrase, "voters residing within the area to be deannexed," *see* Tenn. Code Ann. § 6-51-201(b)(3), would be "those persons who reside on a lot which is wholly or partially to be deannexed and are registered to vote in either Hamilton or Marion County." The trial court reasoned that other possible interpretations advanced by the parties, such as only allowing voting by those registered to vote in Hamilton County or those residents whose homes were situated within the area to be deannexed, would be too narrow an interpretation pursuant to the Supreme Court's reasoning espoused by *Topside & Louisville Rd. See* 881 S.W.2d at 270.

The trial court also noted that an election regarding a deannexation ordinance would "invoke the protections against infringements to the fundamental right to vote." *See, e.g., Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 629 (1969) (quoting *Harper v. Virginia Bd. Of Elections*, 383 U.S. 663, 665 (1966) ("once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The court reasoned that allowing voting by those who (1) were registered in either Hamilton or Marion County and (2) reside on a lot which is wholly or partially to be deannexed would ensure that the constitutional requirement of equal protection was met by ensuring that all of those citizens residing in the affected area were able to vote.

Finally, the trial court explained that its interpretation of Tennessee Code Annotated § 6-51-201(b)(3) would comply with the District Court's ruling in *Brown v. Bd. of Comm'rs of City of Chattanooga, Tenn.* by only allowing voting by those who live on an affected lot. *See* 722 F. Supp. 380, 399 (E. D. Tenn. 1989) (ruling that the Chattanooga city charter violated the equal protection clause of the Fourteenth Amendment by giving nonresident property owners the right to vote in municipal elections.). The court noted that its

interpretation would include tenants and lessees who reside on affected lots, rather than just property owners.

We agree with the trial court's analysis on this issue. Tennessee Code Annotated § 6-51-201(b)(3) utilizes the phrase, "voters residing in the area to be deannexed." As previously explained, this Court must apply the plain meaning of a clear and unambiguous statute and "simply . . . enforce the written language." *Estate of French*, 333 S.W.3d at 554. The most reasonable interpretation of this clear language is to allow those voters who reside on a lot anywhere within the area proposed for deannexation to vote, regardless of whether they are registered in Hamilton or Marion County or whether their actual home is within the proposed area. The interpretation imposed by the trial court comports with all applicable law and enforces the language of the statute. Therefore, we conclude that the trial court made a proper determination regarding who was qualified to vote in the referendum election regarding the challenged deannexation ordinance.

## VII. Final Order

Plaintiffs argue that the trial court erred by certifying its November 1, 2012 order (as amended by its November 13, 2012 order) to be final pursuant to Tennessee Rule of Civil Procedure 54.02. Plaintiffs assert that no analysis or evidence existed supporting the court's determination that there was "no just reason for delay." Defendants contend that the trial court properly granted HCEC's motion seeking a certification of the election contest and voter eligibility ruling, thus enabling HCEC to go forward with preparations for a new election. We agree with Defendants.

Tennessee Rule of Civil Procedure 54.02 provides:

When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the Court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.

-14-

Regarding Tennessee Rule of Civil Procedure 54.02, our Supreme Court has explained:

> Rule 54.02 requires as an absolute prerequisite to an appeal the certification by the trial judge, first, that the court has directed the entry of a final judgment as to one or more but fewer than all of the claims, and, second, make an express determination that there is no just reason for delay. Such certification by the trial judge creates a final judgment appealable as of right under Rule 3 T.R.A.P.

*Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983). This Court quoted *Fox* with approval in *Huntington Nat'l Bank v. Hooker*, 840 S.W.2d 916, 922 (Tenn. Ct. App. 1991), wherein this Court ruled:

> There is no requirement in Tennessee that the trial court state the underlying reasons for certification pursuant to Rule 54.02. We can think of no compelling reason to adopt such a rule. We do state that it is the better practice for the trial court to provide a finding of fact showing the basis of its decision to grant the Rule 54.02 certification.

This Court ultimately held in *Huntington* that, based on a thorough review of the record, the trial court's basis for stating there was "no just reason for delay" was apparent and justified. *Id.*

In another decision involving the issue of whether certification pursuant to Tennessee Rule of Civil Procedure 54.02 was proper, this Court further elucidated:

> Our review of a Rule 54.02 certification of a judgment as final is conducted under a dual standard. *Carr v. Valinezhad*, M2009-00634-COA-R3-CV, 2010 WL 1633467 at *2 (Tenn. Ct. App. Apr. 22, 2010)(citing *Brown v. John Roebuck & Assocs., Inc.*, No. M2008-02619-COA-R3-CV, 2009 WL 4878621, at *5 (Tenn. Ct. App. Dec.16, 2009)). First the appellate court must determine whether an order disposed of one or more but fewer than all of the claims or parties, which is a question of law we review de novo. *Id.* (citing *Gen. Acq., Inc. v. GenCorp., Inc.*, 23 F.3d 1022, 1027 (6th Cir.1994)). If the order properly disposes of one or more but fewer than all of the claims or parties, we are then required to determine whether there is no just reason for delay, a question which is reviewed under the abuse of discretion standard. *Carr* at *2 (citing *Brown*, 2009 WL 4878621 at *5).

The Tennessee Supreme Court explained the abuse of discretion standard in *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001): "Under the abuse of discretion standard, a trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." *Eldridge* at 85. The application of the abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court. *Id*.

. . .

The Court in *Tuturea v. Tennessee Farmers Mut. Ins. Co.*, W2006-02100-COA-R3-CV, 2007 WL 2011049 (Tenn. Ct. App. July 12, 2007) stated that although a trial court's decision regarding whether to certify a judgment as final under Rule 54.02 is generally reviewed under an abuse of discretion standard, "this Court has noted that '[t]he rule itself establishes the basic legal standard,' and our Supreme Court has stated that it does not encourage the practice of "certifying interlocutory judgments as final under Rule 54.02, thereby requiring a litigant to file an appeal while the remainder of the litigation is ongoing. . . ." *Tutuerea* at *3 (citing *Harris v. Chern*, 33 S.W.3d 741, 745, n. 3 (Tenn. 2000)). The Tennessee Supreme Court in *Harris v. Chern* stated that "[p]iecemeal appellate review is not favored" and that "[o]rders certifying interlocutory judgments as final "should not be entered routinely" and "cannot be routinely entered as a courtesy to counsel." *Huntington Nat'l Bank* at 921.

This Court has adopted from the federal jurisprudence a list of factors that a trial court should consider in deciding whether or not to certify an interlocutory judgment as final under Rule 54.02 in *Cates v. White*, 03A01-9104-CH-00130, 1991 WL 168620 (Tenn. Ct. App. Sept. 4, 1991). In that case the Court looked to federal law for guidance because Tenn. R. Civ. P. 54.02 is substantially identical to the Federal Rule of Civil Procedure 54(b). The *Cates* Court then stated:

> The purpose of the certification rule is to enhance judicial economy and "to prevent piecemeal appeals in cases which should be reviewed only as single units." *Curtiss-Wright Corp. v. General Electric Co.*, 100 S.Ct. 1460 at 1466, 446 U.S. 1 at 10 (1980); *see also Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 62 (6th Cir.1986). An order or judgment is certifiable "only if it disposes of at least one claim" or party. *Rudd Construction*

*Equipment Co., Inc. v. Home Ins. Co.*, 711 F.2d 54, 56 (6th Cir.1983). T.R.C.P. 54.02.

The factors which must be weighed in determining whether a certification is proper are set out in full in *Allis Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360 at 364 (3d Cir.1975):

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like. Depending upon the facts of the particular case, all or some of the above factors may bear upon the propriety of the trial court's discretion in certifying a judgment as final under Rule 54(b).

The existence of one factor does not automatically make certification improper. *Curtiss-Wright Corp., supra*, at 1465. Instead, the trial court must weigh the existence of all the factors in making its determination.

In reviewing a 54.02 certification, deference must be given to the trial court's determination. "The question in cases [of 54(b) certification] is likely to be close, but the task of weighing and balancing the contending factors is peculiarly one for the trial judge, who can explore all the facets of a case." *Curtiss-Wright Corp. v. General Electric Co.*, 100 S.Ct. 1460 at 1467, 446 U.S. 1 (1980). *See also Solomon v. Aetna Life Ins. Co.*, 782 F.2d 58, 61 (6th Cir.1986). However, deference rests on the assumption that, in reaching the certification decision, the trial court has

-17-

weighed the factors listed above. *Solomon*, at 61. "[A]ny abuse of that discretion remains reviewable by the Court of Appeals." *Sears, Roebuck & Co. v. Mackey*, 76 S.Ct. 895, 901, 351 U.S. 427, 437 (1956). If the certification is deemed improper, the appellate court then vacates the judgment and remands for further disposition. *Bayberry*, at 559.

*Cates* at *3 (citing *Allis Chalmers Corp. v. Philadelphia Electric Co.*, 521 F.2d 360 at 364 (3d Cir.1975)).

*FSGBank, N.A. v. Anand*, No. E2011-00168-COA-R3-CV, 2012 WL 554449 at *3-6 (Tenn. Ct. App. Feb. 21, 2012).

In the case at bar, the trial court clearly disposed of one but not all of Plaintiffs' claims by ruling that the prior election was void and ordering a new election to be held. The trial court also expressly directed that its order regarding the election be deemed final and declared that there was no just reason for delay. A thorough review of the record demonstrates that this certification was requested by HCEC to facilitate preparations for the new election. An examination of the factors listed above does not demonstrate an abuse of discretion by the trial court in certifying the order as final. As Defendants note, Plaintiffs' other claims were ultimately dismissed by the trial court. We have now affirmed this dismissal. Therefore, there is no basis for ruling that the trial court improperly certified the order regarding the election contest claim as final.

VIII. Metes and Bounds Description

Plaintiffs also assert that the trial court erred by failing to require in the Ordinance a metes and bounds description of the property to be deannexed. Plaintiffs argue that if, as the trial court found, the filing of their petition opposing the Ordinance "caused the procedure for deannexation to change from contraction by adoption of the Ordinance by the City Council to contraction by referendum," then a metes and bounds description of the territory to be deannexed was required to be reported pursuant to Tennessee Code Annotated § 6-51-202.

We note first a flaw in the trial court's analysis that the contraction-by-ordinance procedure was somehow converted to a contraction-by-election procedure when Plaintiffs filed a petition seeking review of the Ordinance. As previously stated, there are two methods by which a municipality may contract its boundaries: (1) an election receiving approval of three-fourths of the qualified voters or (2) an ordinance receiving support of a majority of the city's legislative body. *See* Tenn. Code Ann. § 6-51-201(a), (b). When the

municipality chooses to contract its boundaries by passing an ordinance, the voters residing in the area to be deannexed may oppose the ordinance by filing a proper petition. *See* Tenn. Code Ann. § 6-51-201(b)(3). If such a petition is filed, a referendum election must be held during the next general election. *Id.* If a majority of those voting in the referendum fail to approve the deannexation ordinance, it shall be deemed void. *Id.*

This is precisely what occurred in the case at bar. The City Council passed a deannexation ordinance, and Plaintiffs filed a petition opposing the Ordinance that was signed by ten percent of the voters residing in the area to be deannexed. The filing of this petition triggered the statutory review of the Ordinance by referendum election. *See* Tenn. Code Ann. § 6-51-201(b)(3). It did not, however, convert the procedure to contraction by election pursuant to Tennessee Code Annotated § 6-51-201(a). The contraction-by-election procedure is a completely distinct process requiring the approval of a super-majority of voters. *Id.*

Because the deannexation process utilized by the City was not the contraction-by-election procedure provided for in Tennessee Code Annotated § 6-51-201(a), the metes and bounds description was not required. Tennessee Code Annotated § 6-51-202 provides:

> The election provided for in § 6-51-201, shall be held under the provisions of an ordinance to be passed for that purpose. A full report of the election shall be spread upon the minutes of the board, if three fourths ( ¾ ) of the voters assent to the contraction, and in the report the metes and bounds of the territory to be excluded must be fully set forth.

While we observe that this statutory section has never been interpreted by our appellate courts, we conclude that it is referring to the contraction-by-election procedure provided in Tennessee Code Annotated § 6-51-201(a), rather than the referendum review of the contraction-by-ordinance procedure provided in Tennessee Code Annotated § 6-51-201(b)(3). Tennessee Code Annotated § 6-51-202 refers to an election receiving approval of three-fourths of the qualified voters, which is only applicable to Tennessee Code Annotated § 6-51-201(a). Further, we note that Tennessee Code Annotated § 6-51-202 is virtually identical to former code section 6-305, and under that prior version of the statute there was only one means to deannex property: contraction by election. Therefore, we conclude that Tennessee Code Annotated § 6-51-202 does not apply to this action based on contraction by ordinance.

IX. Geographic Information System Data

Plaintiffs assert that the trial court erred by admitting into evidence Geographic

Information System data and witnesses' testimony regarding that data. Plaintiffs refer specifically to Exhibits 12, 56, 57, 70, and 71 and the testimony related thereto. Defendants contend that the GIS data was introduced initially by Plaintiffs and that Plaintiffs should not now be allowed to complain regarding its use at trial. We agree with Defendants.

A review of the transcript demonstrates that Plaintiffs first introduced the GIS map that was marked as Exhibit 12 during the deposition testimony of Charlotte Mullis-Morgan, representative of the HCEC. Plaintiffs later criticized the use of this map, asserting that it was not "to scale" and that it contained a disclaimer stating that it was not a legal document. Plaintiffs also introduced Exhibit 56, entitled "Master Interlocal Agreement & Growth Boundaries Maps." Plaintiffs utilized this map to show that, pursuant to the map, Ms. Rich's home was located within the City of Chattanooga.

Exhibits 70 and 71 were marked for identification only. Exhibit 57 was apparently an aerial map that was retained by the trial court and does not appear in the appellate record. The only testimony that was elicited from this map concerned the location of Ms. Rich's property, as well as the general location of property belonging to David and Laurel Krishock. These facts were also established by other evidence.

Plaintiffs now object to the use of all GIS data and maps, stating that these maps and data are based upon "hearsay and assumptions about the accuracy of third-party vendor's efforts." As noted previously, a party cannot be "permitted to take advantage of errors which he himself committed, or invited, or induced the trial Court to commit, or which were the natural consequence of his own neglect or misconduct." *See Gentry*, 100 S.W.2d at 231. Plaintiffs thus cannot complain about the admission and use of exhibits that they introduced and utilized. *See, e.g., Thomas v. State*, 113 S.W. 1041, 1042 (Tenn. 1908) ("[I]f a party opens the door for the admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus opened."). Further, all evidence regarding maps and property boundaries related to the question of who properly should have voted in the August 2012 election. Regarding the August 2012 election, however, the trial court stated:

> although the issue of eligibility certainly affects the validity of the deannexation referendum vote, the procedural deficiencies within the way the referendum was handled are sufficient to render the deannexation referendum void, without having to address in detail whether all those who voted were eligible to vote under the Court's interpretation of T.C.A. § 6-51-201(b)(3).

Therefore, any alleged error involving the trial court's use of GIS data and maps in the determination of who was properly qualified to vote in the August 2012 election is harmless,

as it in no way affected the ultimate outcome of the case.

## X. Assessment of Costs

Finally, Plaintiffs take issue with the trial court's assessment of court costs. Plaintiffs assert that the trial court abused its discretion by assessing forty percent of the court costs against the Plaintiffs when they were the prevailing "private citizens who courageously sought to uphold the integrity of an election." Plaintiffs and Defendants agree, however, that the decision regarding assessment of court costs is left to the sound discretion of the trial court.

It is well settled that Tennessee appellate courts review a trial court's assessment of costs utilizing an abuse of discretion standard. *See Lewis v. Bowers*, 392 S.W.2d 819, 823 (Tenn. 1965); *see also Long v. Long*, 957 S.W.2d 825, 833-34 (Tenn. Ct. App. 1997). Tennessee Code Annotated § 20-12-119 provides:

> (a) In all civil cases, whether tried by a jury or before the court without a jury, the presiding judge shall have a right to adjudge the cost.

> (b) In doing so, the presiding judge shall be authorized, in the presiding judge's discretion, to apportion the cost between the litigants, as in the presiding judge's opinion the equities of the case demand.

Further, Tennessee Rule of Civil Procedure 54.04 states that "costs included in the bill of costs prepared by the clerk shall be allowed to the prevailing party unless the court otherwise directs . . . ."

Plaintiffs contend that the trial court should not have assessed any court costs to them, as they were the "substantially prevailing" parties. A similar argument was made by the plaintiff in *LeBrun v. Elmore*, No. E1999-01523-COA-R3-CV, 2000 WL 224628 (Tenn. Ct. App. Feb. 28, 2000), who asserted that to tax costs against the prevailing party constitutes an abuse of discretion. In response to that argument, this Court explained:

> [O]n appeal Plaintiff must show extraordinary circumstances to overcome the presumption in favor of the discretionary purview of the Trial Court in taxing the costs of the Trial Court. "Tenn. Code Ann. § 20-12-119 and Tenn. R. Civ. P. 54.04 give trial courts the authority to tax the costs incurred in the trial court. These determinations are within the trial court's discretion, and they will be reviewed on appeal only under very extraordinary circumstances." *Rogers v. Russell*, 733 S.W.2d 79, 88 (Tenn. Ct. App. 1986). No such

-21-

extraordinary circumstances appear in the record before us.  The Judgment of the Trial Court as to the issue regarding taxation of court costs is affirmed.

*LeBrun*, 2000 WL 224628 at *6.

Similarly, in this case, there has been no showing of extraordinary circumstances or an abuse of discretion by the trial court.  "Under the abuse of discretion standard, a trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining."  *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).  The abuse of discretion standard of review does not allow the appellate court to substitute its judgment for that of the trial court. *Id*.  Plaintiffs have not demonstrated that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning in this matter.  This issue is without merit.

## XI.  Conclusion

The judgment of the trial court is affirmed.  Costs on appeal are taxed to appellants, Susan E. Rich, Janis S. Burger, and Carole Klimesch.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE