IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2020 Session

## JANET TIDWELL v. HOLSTON METHODIST FEDERAL CREDIT UNION, ET AL.

Appeal from the Circuit Court for Knox County
No. 1-300-18    Kristi M. Davis, Judge

_____

### No. E2019-01111-COA-R3-CV

_____

Former CEO brought an action for libel, false light invasion of privacy, and retaliatory discharge pursuant to the Tennessee Public Protection Act. In this appeal from the trial court's dismissal of the amended complaint pursuant to Tennessee Rule of Civil Procedure 12.02(6), we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

David L. King, Nashville, Tennessee, and Forrest L. Wallace, Knoxville, Tennessee, for the appellant, Janet Tidwell.

Jay W. Mader and Paul E. Wehmeier, Knoxville, Tennessee, for the appellees, Holston Methodist Federal Credit Union, Reed Shell, and Angela Lee.

L. Gino Marchetti, Jr., and Lauren M. Poole, Nashville, Tennessee, for the appellee, Shawna Southerland.

### OPINION

### I.    BACKGROUND

Janet Tidwell ("Plaintiff") was employed by Holston Methodist Federal Credit Union ("the credit union") from 1990 until her February 26, 2018, termination. She was the credit union's CEO at the time of her firing. The credit union is federally chartered under the Federal Credit Union Act. It has a Board of Directors, chaired by Defendant

Reed Shell.  The Supervisory Committee, chaired by Defendant Angela Lee, oversees the Board to ensure that the Board fulfills its fiduciary responsibilities.  Defendant Shawna Southerland is an independent auditor employed by CU Audit and Compliance Group.

On December 4, 2017, regulatory agency the National Credit Union Administration ("NCUA") began its annual audit of the credit union.  According to Plaintiff's operative amended complaint, the NCUA was concerned about Board member absenteeism, solvency standards required by the credit union's by-laws, and the failure to meet Federal Credit Union Act standards.  Plaintiff feels that she became the scapegoat for these problems.  Specifically, her amended complaint alleges that Defendant Shell undertook "a pattern of investigation and 'deeper audit'" (conducted by Defendant Southerland) to "deflect responsibility" onto Plaintiff for the credit union's failures identified in the NCUA audit.  Plaintiff alleges that Defendants Shell, Lee, and the credit union (collectively, "the credit union Defendants"), in concert with Defendant Southerland, "began in 2018 to wrongfully and fraudulently recast" the credit union's economic condition, performance, and operations to make "Plaintiff appear complicit and responsible for conduct that made [the credit union] financially unsound and not in compliance with the standards and financial soundness required by the National Credit Union Administration."  The "recasting" of the credit union's financial condition "was false and casts the Plaintiff in a false light," she alleges.  Plaintiff further alleges that all Defendants knew or should have known that the information in the recast audit was false.

Plaintiff alleges that Defendant Southerland, through the findings of the independent audit, stated to Defendants Shell and Lee that Plaintiff had violated policies and standards required of federally chartered credit unions and encouraged her termination.  She claims that the recast audit was "transmitted by written publication" to the credit union members, unspecified others in the Holston Conference of the United Methodist Church, and unspecified others outside the credit union membership.

The Board of Directors announced the change in leadership to the credit union's members via an email sent February 28, 2018.  Plaintiff's amended complaint misquotes the email, but the full, correct wording is an exhibit to the amended complaint:

> For over 62 years our members have put their trust in our staff, including the leadership provided by our Board of Directors and our management team, to serve their financial needs.  Today, HMFCU Board of Directors would like to continue to earn that trust by announcing the departure of Janet Tidwell as CEO.
>
> Over the years Holston Methodist Federal Credit Union has provided trustworthy service to thousands of members with a wide range of financial

needs. We are dedicated to maintaining that trust and high quality service for many years to come. We remain firm in our Mission Statement, "To be a safe and sound credit union which provides unique, beneficial service to the membership in the spirit of mutual and authentic caring."

Plaintiff alleges that the foregoing language was copied from another credit union board's statement when it announced the termination of its executive who was found guilty of theft. Plaintiff alleges that the use of an identical statement announcing her departure was libelous and cast her in a false light as a criminal. Plaintiff further alleges that Defendant Southerland was responsible for the credit union's knowledge and use of the statement because she was the only one who knew the wording due to her previous audit work at the other credit union.

Additionally, Plaintiff alleges that, at the end of 2017, the credit union reported positive income to the National Credit Union Administration, but that Defendant Shell reported a finding that the credit union's income was negative for 2017 at a special meeting held on June 8, 2018. Plaintiff claims "that the report generated by Defendant Shell was intended to cast [her] in a false light and thus serve as a justification for firing Plaintiff in February 2018."

Finally, Plaintiff broadly alleges she was terminated in violation of the Tennessee Public Protection Act "based on" her "exercise of and faithful compliance with public policy, and her refusal to violate or submit herself to violations in the course of her employment of clear and unambiguous public policy, rules and regulations, constitutional guarantees and statutes, more particularly those laws, rules and regulations set forth under the Federal Credit Union Act and/or the rules, regulations and policies required by the [NCUA]."

Plaintiff's amended complaint was filed December 10, 2018. On December 31, 2018, the credit union Defendants moved to dismiss the claims against them. Defendant Southerland filed her own motion to dismiss on January 15, 2019. Following a hearing, and by final order entered May 21, 2019, the trial court granted both motions to dismiss. This appeal followed.

## II. ISSUES

We restate the issues on appeal as follows:

A.      Whether the trial court erred in dismissing Plaintiff's retaliatory discharge claim.

B.     Whether the trial court erred in dismissing Plaintiff's claims of libel and false light invasion of privacy.


### III.     STANDARD OF REVIEW

Regarding a Tennessee Rule of Civil Procedure 12.02(6) motion to dismiss, our Supreme Court has instructed as follows:

> A motion to dismiss a complaint for failure to state a claim for which relief may be granted tests the legal sufficiency of the plaintiff's complaint. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 894 (Tenn. 2011); *cf. Givens v. Mullikin ex rel. Estate of McElwaney*, 75 S.W.3d 383, 406 (Tenn. 2002). The motion requires the court to review the complaint alone. *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d 695, 700 (Tenn. 2009). Dismissal under Tenn. R. Civ. P. 12.02(6) is warranted only when the alleged facts will not entitle the plaintiff to relief, *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011), or when the complaint is totally lacking in clarity and specificity, *Dobbs v. Guenther*, 846 S.W.2d 270, 273 (Tenn. Ct. App. 1992) (citing *Smith v. Lincoln Brass Works, Inc.*, 712 S.W.2d 470, 471 (Tenn. 1986)).
>
> A Tenn. R. Civ. P. 12.02(6) motion admits the truth of all the relevant and material factual allegations in the complaint but asserts that no cause of action arises from these facts. *Brown v. Tennessee Title Loans, Inc.*, 328 S.W.3d 850, 854 (Tenn. 2010); *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d at 700. Accordingly, in reviewing a trial court's dismissal of a complaint under Tenn. R. Civ. P. 12.02(6), we must construe the complaint liberally in favor of the plaintiff by taking all factual allegations in the complaint as true, *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d at 894; *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d at 426; Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 5–6(g), at 5–111 (3d ed. 2009). We review the trial court's legal conclusions regarding the adequacy of the complaint de novo without a presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d at 895; *Highwoods Props., Inc. v. City of Memphis*, 297 S.W.3d at 700.

*SNPCO, Inc. v. City of Jefferson City*, 363 S.W.3d 467, 472 (Tenn. 2012).

# IV.   DISCUSSION

## A.

In her amended complaint, Plaintiff asserts a claim of retaliatory discharge pursuant to the Tennessee Public Protection Act ("TPPA"), which provides that "No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304(b).[1] The statute defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). A plaintiff bringing a claim under the TPPA must establish: (1) the plaintiff was an employee of the defendant; (2) the plaintiff refused to participate in or remain silent about illegal activity; (3) the defendant employer discharged or terminated the plaintiff's employment; and (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity. *Williams v. City of Burns*, 465 S.W.3d 96, 111 (Tenn. 2015).

Plaintiff alleges that she was discharged from her position as chief executive officer and further alleges as follows:

> The Defendants' decision to terminate the Plaintiff was based on the Plaintiff's exercise of and faithful compliance with public policy, and her refusal to violate or submit herself to violations in the course of her employment of clear and unambiguous public policy, rules and regulations, constitutional guarantees and statutes, more particularly those laws, rules and regulations set forth under the Federal Credit Union Act and/or the rules, regulations and policies required by the [NCUA]."

> The Plaintiff's termination was based on her refusal to participate in activities or remain silent about activities that were illegal or contrary to the statutes, rules and regulations promulgated pursuant to the Federal Credit Union Act or the NCUA.

Because the foregoing allegations are made against "The Defendants," it is unclear whether Plaintiff means to assert a TPPA claim against Defendant Southerland. If so, such a claim fails as a matter of law because Plaintiff was not an employee of Defendant

---

[1] "The TPPA essentially codified the common-law cause of action for retaliatory discharge." *Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015); *see also* Tenn. Code. Ann. § 50-1-304(g).

Southerland. As the trial court correctly noted, the allegations in support of Plaintiff's TPPA claim are broad, conclusory, and fail to "identify any sections of the Tennessee or United States Code or any regulations intended to protect the public health, safety, or welfare." *See* Tenn. Code Ann. § 50-1-304(a)(3). This deficiency alone causes Plaintiff's TPPA claim to fail as matter of law.

Furthermore, the amended complaint does not allege that Plaintiff reported any alleged illegal activity by the Board, by the Supervisory Committee, or by the credit union generally to the NCUA or to anyone besides Defendants Shell and Lee. Instead, Plaintiff alleges that "upon being confronted with the board member attendance issues during the NCUA exam and with the information that the Board was out of compliance with its bylaws, Defendant Shell and Defendant Lee refused to accept their responsibilities . . . and instead fired the Plaintiff to save face." In *Haynes v. Formac Stables*, our Supreme Court affirmed the dismissal of a plaintiff's claims when, by his own allegations, he had not reported the illegal activity to anyone other than the person responsible for the activity. The Court reasoned:

> When an employee reports wrongdoing only to the wrongdoer—who is already aware of his or her own misconduct—there has been no exposure of the employer's illegal or unsafe practices. Such an employee necessarily fails to 'blow the whistle' in a meaningful fashion because the employee has made no 'effort[] to *bring to light* an illegal or unsafe practice.'

*Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 40 (Tenn. 2015) (quoting *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007)). The Court specifically held "that an employee must report an employer's wrongdoing to someone other than the wrongdoer to qualify as a whistleblower, which may require reporting to an outside entity when the wrongdoer is the manager, owner, or highest ranking officer within the company." *Haynes v. Formac Stables, Inc.*, 463 S.W.3d at 35.

Here, because Plaintiff does not allege that she reported her employer's alleged wrongdoing to anyone besides Defendants Shell and Lee, she has not stated a viable claim under the TPPA. For all of the reasons explained above, we affirm the trial court's dismissal of Plaintiff's retaliatory discharge claim pursuant to the TPPA.

## B.

The remaining claims in Plaintiff's amended complaint arise from: (1) the email announcement about Plaintiff's departure from the credit union, (2) Defendant Shell's

statement at the June 8, 2018, meeting, and (3) the audit report submitted by Defendant Southerland. We will examine each communication in turn.

Libel is written defamation and slander is spoken defamation. *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994). To establish a prima facie case of defamation, "the plaintiff must establish that: 1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). "For a communication to be libelous, it must constitute a serious threat to the plaintiff's reputation." *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *3 (Tenn. Ct. App. Sept. 30, 2015) (perm. app. denied). Libel does not arise "simply because the subject of a publication finds the publication annoying, offensive or embarrassing. The words must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule. They must carry with them an element of disgrace." *Id*. (citations omitted). "'[W]hether a communication is capable of conveying a defamatory meaning is a question of law for the court to decide in the first instance; it is then for the jury to decide whether the communication was in fact so understood by those who received it.'" *Id*. (quoting *Brown v. Mapco Express, Inc*., 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012)). We "look to the words themselves and are not bound by the plaintiff's interpretation of them." *Stones River Motors, Inc. v. Mid-South. Publ'g. Co., Inc*., 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983).

Our Supreme Court adopted the following definition of the tort of false light invasion of privacy:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*West v. Media Gen. Convergence, Inc*., 53 S.W.3d 640, 643-44 (Tenn. 2001) (quoting Restatement (Second) of Torts § 652E (1977)). In *West*, the Court explained:

The facts may be true in a false light claim. However, the angle from which the facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light. Literal accuracy of separate statements will not render a communication true where the implication of the communication as a whole was false.

*Id*. at 645 n.5 (internal quotations and citations omitted).

We turn now to the email announcement about Plaintiff's departure from the credit union which Plaintiff alleges "is libelous and casts [her] in a false light."[2] In her amended complaint, Plaintiff incorrectly states that the email announced her "termination." As the exhibit to the amended complaint shows, the email announced Plaintiff's "departure" as CEO of the credit union. Looking at the words of the email itself, we find that the email is not capable of conveying a defamatory meaning. First, the statements are factually true because Plaintiff was indeed departing the credit union, and Plaintiff does not allege that any part of the email is false. *See Stones River Motors*, 651 S.W.2d at 719. Second, the words of the email are not reasonably construable as holding Plaintiff up to public hatred, contempt, or ridicule. *Davis*, 2015 WL 5766685 at *3. Accordingly, we conclude that no cause of action for libel arises from Plaintiff's allegations concerning the email announcement of her departure from the credit union.[3]

To assert a claim for false light invasion of privacy, a plaintiff must plead facts showing a defendant gave publicity to the communication at issue. *West*, 53 S.W.3d at 644. The facts pleaded may not be speculative. *Webb*, 346 S.W.3d at 426. In *Brown*, this court explained that "publicity" means that the communication at issue must be "'made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Brown*, 393 S.W.3d at 707 (quoting *Secured Fin. Solutions, LLC v. Winer*, No. M2009-00885-COA-R3-CV, 2010 WL 334644, at *4 (Tenn. Ct. App. Jan. 28, 2010)). "[D]isclosure to one person or a small group [is] not sufficient to sustain an action." *Secured Fin. Solutions, LLC*, 2010 WL 334644 at *4.

_____

[2] In her brief, Plaintiff argues that a "defamation by implication or innuendo claim" purportedly arises from the email announcement. Such a claim was not presented to the trial court and is not pleaded in Plaintiff's amended complaint, so we will not consider it. A motion to dismiss is resolved "by an examination of the pleadings alone." *Webb*, 346 S.W.3d at 426.

[3] Furthermore, Plaintiff does not allege that Defendant Southerland published the email announcement, so the libel claim cannot be asserted against her for this reason as well. *Sullivan*, 995 S.W.2d at 571; *Freeman v. Dayton Scale Co.*, 19 S.W.2d 255, 256 (Tenn. 1929) ("[In] a civil and not a criminal suit for libel, it is essential that there be publication; that is, a communication of the defamatory matter to a third person.").

Plaintiff alleges that the credit union, through Defendants Shell and Lee, "caused to be published" the email announcing her departure as CEO "electronically through the internet to members of the [credit union] and to other publications." Plaintiff further alleges that unnamed others "in turn" distributed the email announcement to unnamed "other affiliates" in the United Methodist Church. She alleges that the email used "the exact wording from a previous statement issued by [another credit union's] board of director's statement, which was published to announce the termination of another credit union executive who was found guilty of criminal charges that she stole some $1.2 million dollars." Additionally, Plaintiff alleges that "Defendant S[o]utherland was the only party with prior knowledge of the statement, as she was also the auditor for [the other credit union]."

Plaintiff's allegations that the email announcement reached individuals outside of the credit union are indirect and speculative, so we do not accept them as true. *See Webb*, 346 S.W.3d at 427; *Leach v. Taylor*, 124 S.W.3d 87, 92 (Tenn. 2004). As to the credit union Defendants, Plaintiff has adequately pleaded facts to satisfy the publicity requirement at this stage of litigation because she alleges that the credit union sent the email to its members. However, the statements in the email announcement cannot be considered "highly offensive to a reasonable person," as required for Plaintiff to proceed on a false light invasion of privacy claim against the credit union Defendants. *West*, 53 S.W.3d 640, 644. This is because she alleges Defendant Southerland was the only person who could have known that the other credit union had used the same statements when its executive was convicted of theft. Without knowledge of the fact that another credit union had used the same language in reference to its executive who had been terminated for criminal activity, a recipient of the email announcement at issue here could not have understood that similar misconduct was being imputed to Plaintiff. The statements in the email announcement are not susceptible to inferences that would cast Plaintiff in a false light. *See West*, 53 S.W.3d at 645 n.5. For these reasons we conclude that, as against the credit union Defendants, no cause of action for false light invasion of privacy arises from Plaintiff's allegations concerning the email announcement of her departure. Plaintiff's false light invasion of privacy claim against Defendant Southerland fails because Plaintiff does not allege that Defendant Southerland gave publicity to the email announcement.

Next, we turn to the statement Defendant Shell allegedly made at the June 8, 2018, meeting. In her amended complaint, Plaintiff alleges as follows:

> Information reported by [the credit union] to NCUA at the end of 2017 showed positive income. However, Defendant Shell, as Board Chairman, *reported* at a special meeting held on June 8, 2018, that [the credit union's] income was negative for 2017. . . . Plaintiff avers that the *report generated*

*by* Defendant Shell was intended to cast the Plaintiff in a false light and thus serve as a justification for firing Plaintiff in February 2018. . . . [T]he subsequent *recasting* of the financial condition of [the credit union] was false and casts the Plaintiff in a false light. She further alleges . . . that the *report* was *generated* to further cast the Plaintiff in a false light in that the Plaintiff [w]as complicitous in the falsely depicted financial woes of [the credit union].

(Emphasis added). The amended complaint is vague, perhaps intentionally so, as to whether Defendant Shell's "report" was in the form of a spoken or a written statement. Again, a claim for libel stems from a written defamatory statement, as distinguished from a claim for slander, which stems from a spoken defamatory statement. *See Certain v. Goodwin*, No. M2016-00889-COA-R3-CV, 2017 WL 5515863, at *3 (Tenn. Ct. App. Nov. 17, 2017) (citing *Quality Auto Parts Co.*, 876 S.W.2d at 820). In any event, in reviewing a dismissal under Rule 12.02(6) we assume that the statement about negative income made by Defendant Shell, in whatever form it was communicated, is false, as Plaintiff alleges. However, we find that the statement is not capable of conveying a defamatory meaning. Defendant Shell made the statement over three months after Plaintiff's termination. Plaintiff does not allege that Defendant Shell made a statement linking her departure to his statement about negative income in the year 2017. With these considerations in mind, we find that Defendant Shell's statement made at the June 8, 2018, meeting is not reasonably "construable as holding [Plaintiff] up to public hatred, contempt or ridicule" and does not "constitute a serious threat to [Plaintiff's] reputation." *Davis*, 2015 WL 5766685 at *3. As to all other Defendants, Plaintiff does not allege that they published the June 8, 2018, statement. *Sullivan*, 995 S.W.2d at 571.

Moreover, as the trial court found, we do not consider Defendant Shell's reporting of the statement to individuals who attended the June 8 Board meeting[4] to constitute "publication" or "publicity," which are essential elements of libel and false light invasion of privacy. It is well settled that "communication among agents of the same corporation made within the scope and course of their employment relative to duties performed for that corporation are not to be considered as statements communicated or publicized to third persons." *Woods v. Helmi*, 758 S.W.2d 219, 223 (Tenn. Ct. App. 1988) (interpreting *Freeman v. Dayton Scale Co.*, 19 S.W.2d 255 (Tenn. 1929)). The *Woods* court highlighted the "need to know" concept:

While many of the cases denying the existence of a publication speak in terms of corporations communicating to or with itself, it seems to this Court

---

[4] It is fairly drawn from the amended complaint that the June 8, 2018, "special meeting" was a credit union Board meeting. In her brief, Plaintiff confirms that Defendant Shell's statement was made to the Board.

that more essential to the issue is the concept of 'need to know,' with the communication flowing through the proper chain of command, particularly in employee performance reviews or disciplinary action. It could readily be argued that the concept of intra-corporate communications would not apply if, in the case of a review by corporate superiors of the alleged misconduct of a branch manager, the circumstances surrounding his misconduct were communicated also to the corporation's truck driver or janitor, who obviously would not be in the 'need to know' pipeline.

*Id.*; *see also Evans v. Amcash Mortg. Co.*, No. 01A01-9608-CV-00386, 1997 WL 431187, at \*4-5 (Tenn. Ct. App. Aug. 1, 1997); *Perry v. Fox*, No. 01A01-9407-CV-00337, 1994 WL 715740, at \*2 (Tenn. Ct. App. Dec. 21, 1994). Board Chairman Defendant Shell's statement to the Board about the credit union's income falls within these parameters. Accordingly, we conclude that no cause of action for libel or for false light invasion of privacy arises from Plaintiff's allegations concerning the June 8, 2018, statement that the credit union's 2017 income was negative.

Finally, we examine the audit report submitted by Defendant Southerland to the credit union Defendants.[5] Plaintiff alleges "Defendant Southerland reported findings and allegations that were purported to be violations of policy and standards expected of a federally chartered credit union, and through conversations encouraged Defendant Shell, as Board Chairman, and Defendant Lee, to terminate the Plaintiff on grounds that she was responsible for this wrongful conduct and oversight." Plaintiff alleges that the audit report contained statements concerning the credit union's financial soundness and economic condition. Plaintiff further alleges that the statements within the report were false and "were transmitted by written publication to members of the credit union" and to unnamed "others in the Holston Conference of the United Methodist Church" or to unnamed "others outside the membership of [the credit union]." She clarifies that the Holston Conference is not the credit union's affiliate or business associate. Later in the amended complaint, Plaintiff alleges that "[the credit union] further caused [her] to be subject to false light claims by distribution of the recast audit."

Based on our Supreme Court's reasoning in *Freeman* and this court's reasoning in *Woods* and its progeny, we find that the members of the credit union, the Board, Defendant Shell as Chairman of the Board, the Supervisory Committee, and Defendant Lee as Chair of the Supervisory Committee, were business associates in the "'need to know' pipeline." *Woods*, 758 S.W.2d at 223. Such persons had a right or duty to know about the credit union's economic condition. Plaintiff does not argue otherwise. Thus, the communication of the information contained in the audit report to individuals within

---

[5] Under NCUA regulations, a credit union's board of directors and all its committees are authorized to retain and rely on outside consultants. 12 C.F.R. § 701.4(c)-(d)

the credit union does not constitute a "publication" or "publicity."  We note also that Plaintiff alleges that the credit union itself distributed the audit report, but fails to allege *to whom* the credit union distributed the audit report.  It is not fairly inferable from the amended complaint which Defendant may have communicated the information contained in the audit report to unnamed third parties outside of the credit union membership or leadership or to unnamed "others in the Holston Conference."  Without more, these bare allegations do not state a claim of libel or false light invasion of privacy against the credit union.  As to Defendants Shell, Lee, and Southerland, Plaintiff does not allege that they published or gave publicity to the audit report to third parties.[6]  Accordingly, we conclude that no cause of action for libel or for false light invasion of privacy arises from the audit report submitted by Defendant Southerland.

For all of the reasons explained above, we affirm the trial court's dismissal of Plaintiff's libel and false light invasion of privacy claims against the credit union Defendants and against Defendant Southerland.

# V.    CONCLUSION

We affirm the judgment of the trial court.  The case is remanded for such further proceedings as may be necessary and consistent with this opinion.  Costs of the appeal are taxed to the appellant, Janet Tidwell.

_____
JOHN W. McCLARTY, JUDGE

---

[6] In her brief, Plaintiff now alleges for the first time that Defendant Shell, through the Board, presented the findings of the audit report to the Holston Conference at large.  Plaintiff cannot craft new allegations on appeal.  *See* footnote 2 *infra*.

- 12 -